# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 13 CR 00774 |
| GREGORY CHESTER, ARNOLD | ) | |
| COUNCIL, PARIS POE, GABRIEL | ) | Judge John J. Tharp, Jr. |
| BUSH, WILLIAM FORD, and | ) | |
| DERRICK VAUGHN, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER (CORRECTED)

In this case, nine defendants were charged in a Superseding Indictment ("SI") on September 14, 2014. SI, ECF No. 161. Three defendants pleaded guilty before trial, leaving the charges as follows: Count One charged Gregory Chester, Arnold Council, Paris Poe, Gabriel Bush, William Ford, and Derrick Vaughn with conspiracy to violate RICO, *see* 18 U.S.C. § 1962(d); Count Two charged Council and Poe with a Violent Crime in Aid of Racketeering ("VICAR"), namely, the murder of Wilbert Moore, *see* 18 U.S.C. § 1959; Count Three charged Bush with the VICAR murder of victim Terrance Anderson, *see id.*; Counts Four and Five charged Vaughn with the VICAR murder of Antonio Bluitt and Gregory Neeley *see id.*; Count Six charged Poe with Obstruction of Justice by Murder, *see* 18 U.S.C. § 1503, as to victim Keith Daniels; Count Seven charged Council with aiding and abetting the use, carrying, and brandishing of a firearm during a robbery, *see* 18 U.S.C. § 924(c)(1)(A) & (2); and Counts Eight through Ten charged Ford with possession of a firearm by a felon, possession with intent to distribute marijuana, and possession of a firearm in furtherance of a drug trafficking crime, respectively, *see* 18 U.S.C. § 922(g), 21 U.S.C. § 841(a)(1), and 18 U.S.C. § 924(c)(1)(A). The

1

Superseding Indictment was partially superseded once more days before trial; in the Second Superseding Indictment ("SSI"), which had no "counts" enumerated, the grand jury reasserted the Count Six charge against Poe and added allegations specifically identifying the proceedings he was charged with obstructing. *See* SSI, ECF No. 771. After a four-month trial, on January 4, 2017, the jury found each of the six trial defendants guilty on each Count against him, with the exception of Count Ten, of which defendant Ford was acquitted. The defendants have filed motions for a judgment of acquittal, *see* Fed. R. Crim. P. 29, and for a new trial, *see* Fed. R. Crim. P. 33. For the reasons explained below and at trial, the motions are denied. The jury's verdicts stand.

## BACKGROUND

In summary, the government alleged that the defendants, most of whom grew up in the same housing projects on Chicago's south side and were members of gangs—more accurately, in some cases, gang factions—formed a criminal enterprise called the Hobos, which was especially violent, strategic, and lucrative. According to the government, the Hobos banded together with the common purposes of accumulating wealth, expanding their sphere of power, and increasing their reputation and status; they carried out those purposes through a pattern of racketeering acts committed by the defendants and their associates,[1] including murders, shootings, home

---

[1] In these proceedings the government has asserted that the Hobos "included" at least the following 19 individuals: "(1) Gregory Chester, aka Bowlegs; (2) Arnold Council, aka Armstrong; (3) Gabriel Bush, aka Louie; (4) Paris Poe, aka Poleroski; (5) Stanley Vaughn, aka Smiley; (6) Derrick Vaughn, aka D-Block; (7) William Ford, aka Joe Buck; (8) Patrick Davis, aka Lil Pat; (9) Kevin Daniels, aka Parkay; (10) Leon Baylor, aka Leeski; (11) Gary Chester, aka Chee; (12) Walter Thompson, aka Lil Walt; (13) Lance Dillard, aka Double; (14) Rodney Jones, aka Milk; (15) Byron Brown, aka B-Rupt; (16) Brandon Brown, aka Twinsko; (17) Pierre Skipper, aka P-Mac; (18) Chad Todd, aka Young Money; and (19) Ingemar Vaughn, aka Boo." *See, e.g*., Government's Version of the Offense at 2, ECF No. 1227 (The government does not say this is a comprehensive list of all known Hobos.)

invasions, drug trafficking, and robberies. Some of those acts were separately charged in Counts Two through Ten.

Trial was scheduled for September 6, 2016. About a week before the trial, defendant Poe moved for the dismissal of Count Six from the Superseding Indictment because it failed to allege the obstruction of any specific pending judicial proceeding. Poe Mot., ECF No. 747; Govt. Resp., ECF No. 753. As the Court mulled Poe's potentially meritorious argument, the government scurried to the grand jury, which returned a Second Superseding Indictment against Poe on September 1, mooting Poe's motion. The Second Superseding Indictment did not repeat Counts One through Five or Seven through Ten of the First Superseding Indictment, and it was returned against only Poe. Enumerating no count, it simply charged that Poe murdered Keith Daniels in order to obstruct the then-pending drug cases against Gregory Chester and co-defendant Lance Dillard (Daniels was the confidential informant to whom they sold drugs), *see* 13 CR 288 and 289 (N.D. Ill.), as well as the grand jury investigation in this case, 11 GJ 740. At a status hearing on September 2, 2016, this Court noted that Poe's argument had been "well founded" as to the technical deficiency of Count Six, but that the defect was cured by the new charge, with no prejudice to Poe, who was well aware from the discovery process of which judicial proceedings he was alleged to have obstructed. *See* Tr. at 18, ECF No. 1200. The Court overruled Poe's objection that as a matter of right he could not be tried for 30 days after the filing of a superseding indictment (Poe does not specifically challenge that ruling in his pending motions.) *Id*. at 16. Poe was arraigned on September 6, 2016, before the jury selection process began. *See* Tr. at 5, ECF No. 1201. The government did not formally withdraw Count Six of the

superseding indictment, but the Court confirmed: "the trial of that [new] charge will proceed today in lieu of the trial on the Count Six of the . . . first superseding indictment."[2] *See id*. at 6.

Also on the eve of trial, defendant William Ford expressed his desire to plead guilty to Count One. As his co-defendant Stanley Vaughn very recently had done, Ford provided the government and the Court, on August 24, 2016, with a draft plea declaration as to Count One. Ford acknowledged a maximum penalty of 20 years' imprisonment on the conspiracy count. At the hearing on Ford's request to change his plea to Count One, *see* Tr., ECF No. 1198, the government maintained that Ford was possibly subject to a maximum of life imprisonment on Count One, depending on any Additional Findings the jury made beyond a reasonable doubt about specific underlying racketeering acts Ford was alleged to have engaged in. The Court agreed that it would need to advise Ford as part of the Rule 11 colloquy that, pursuant to 18 U.S.C. § 1963(a), the maximum statutory penalty was, potentially, life imprisonment, pending the proof of certain facts beyond a reasonable doubt.[3] *See id*. at 4-6. After an extensive colloquy

---

[2] William Ford, who was not named in the new count and as to whom no findings were made by the jury with respect to the murder of Keith Daniels, raised a contemporaneous objection to proceeding in this fashion. *See* Mot. to Dismiss, ECF No. 804, and the Court's ruling, Order, ECF No. 812; Trial Tr. 3 at 333-334.

[3] Perhaps prompting Ford's desire to plead guilty, the Court had accepted a guilty plea from defendant Stanley Vaughn pursuant to a plea declaration on August 16, 2016. See Trancript, ECF No. 734. The plea declaration reflected Stanley Vaughn's belief that the statutory maximum for him on Count One was 20 years, as he was charged only with Count One and was singled out only in connection with a single act of attempted murder, and thus there would be no factual findings about his conduct that could be used as the basis for an enhanced sentence. Vaughn's attorney represented that Vaughn was "pleading guilty to the conspiracy, the elements of the conspiracy, which is all he needs to do at this time, and simply preserving his right to contest a separate factual issue regarding the shooting of victim No. 4." *Id*. at 4. Counsel further stated: "Mr. Vaughn has been advised ***and he will acknowledge on the record that he understands that he could be subject to life imprisonment if certain facts are found***. And he's willing to submit those facts to Your Honor for factual finding." *Id*. at 5 (emphasis added). This Court ruled that "to have a plea hearing, Mr. Vaughn would have to acknowledge the possibility, based on the government's position that he is still subject to life imprisonment on the basis of this plea, and the government intends to pursue whatever course is necessary to prove up the

with the Court, Ford's counsel stated: "Well, my belief is that if Mr. Ford were to plead guilty

and potentially be admonished that he was facing— that he could be facing life that he would be

waiving—that's my opinion, that he would actually be waiving the argument that he's not

potentially facing life." *See id*. at 8. Counsel therefore agreed, on behalf of Mr. Ford, that "[w]e

cannot go forward, at least today." *Id*. Mr. Ford made no further efforts to change his plea, and

he went to trial beginning on September 6, 2016 along with the five remaining codefendants.

On January 4, 2017, a jury returned verdicts of guilty on all counts against all six trial

defendants as charged in the First and Second Superseding Indictments, with the exception of

Count Ten (possession of a firearm in connection with drug trafficking activity), of which the

only charged defendant, William Ford, was acquitted. After reaching its general verdicts, the jury

also returned "Additional Findings" against each defendant in order to fulfill the mandate that

any facts that effectively raise the statutory maximum penalty be found by a jury beyond a

reasonable doubt. *Apprendi v. New Jersey*, 530 U.S. 466 (2000); *United States v. Smith*, 308 F.3d

726, 740 (7th Cir. 2002) (condoning special verdict form for finding of drug quantity). The jury

had been instructed orally once, before deliberations, on both the General Verdicts and the

Additional Findings. *See* Trial Tr. Vol. 56 at 13411-13434. The jury was instructed, however,

that it should not access the written Additional Findings Instructions and Verdict Forms unless

and until it first completed all the general verdicts and found any defendant guilty. *See id*. To

---

predicates that would lead to the imposition of that sentence." In his change of plea hearing,
Vaughn did acknowledge that the potential penalty he faced for the racketeering conspiracy was
life imprisonment, although he reserved the right to argue during sentencing proceedings that the
government could not show a factual basis for such a sentence. The Court advised him that due
to the competing views of the parties, and the lack of full briefing on the legal issues, there was
at least a possibility that his maximum penalty would be life imprisonment, and that Vaughn had
to "understand and acknowledge that the maximum—potentially the maximum penalty that
could be imposed on you predicated on this conviction will be life in prison." By contrast,
defendant Ford refused to make this acknowledgment, and so his guilty plea was not taken.

reinforce this instruction, the Additional Findings Instructions and Verdict Forms were sealed in a separate envelope with the instruction to open it only after all the General Verdict Forms had been completed and one or more defendants had been found guilty of one or more offenses. The dates of the jurors' signatures on the respective verdict forms suggest they followed those instructions and did not complete any Additional Findings Verdicts until they had completed all of the General Verdict Forms. *See* Redacted Jury Verdict and Additional Findings Forms, ECF No. 1089.[4]

The defendants now file motions for judgment of acquittal, *see* Fed. R. Crim. P. 29, and for a new trial, *see* Fed. R. Crim. P. 33. Each defendant has adopted his co-defendants' motions insofar as they pertain to him and has also incorporated and re-asserted his own objections and motions made before and during the trial.

## DISCUSSION

As a preliminary matter relevant to all the post-trial motions, the government asks the Court to disregard the defendants' motions to the extent they incorporate their own previous arguments or the arguments of other defendant(s), or rest on "conclusory and barebones allegations of error." Govt. Resp. 68, ECF No. 1207. But a defendant's incorporation of his own arguments made before or during trial is permitted after trial. The process requires the review of multiple additional motions, briefs, and written and oral rulings, but the Seventh Circuit apparently allows this approach to raising arguments in the district court, *United States v. Brown*, 726 F.3d 993, 1005 (no waiver where "new trial motion incorporated by reference all objections and positions taken during trial"), although not in the appellate court, *see DeSilva v. DiLeonardi*, 181 F.3d 865, 866 (7th Cir. 1999) (because "incorporation is a pointless imposition on the

---

[4] The Court empaneled an anonymous jury for this trial, and therefore, the signed verdict forms are sealed and access is restricted. *See* Sealed Jury Verdict, ECF No. 1088.

court's time," "[a] brief must make all arguments accessible to the judges, rather than ask them to play archaeologist with the record"). The inefficiencies of this process would hardly be remedied by requiring the defendants to set out at length in their post-trial briefs arguments that have already been developed and addressed. Of course, if a defendant incorporates previous arguments without giving the court good reason to reconsider its previous rulings, there is no reason to restate that analysis here.

It is also permissible for a defendant to adopt a relevant argument made by another defendant. This Court has no use for six sets of motions arguing the same issue if it applies across the board, to the extent that any defendant is willing to rely upon another's framing of the issue and presentation of the argument and authorities. It would not and could not *require* joint briefing of any issue, but nothing prevents the defendants from voluntarily doing so. And if this Court were to accept an argument made by one defendant, it could hardly exclude the other defendants to whom the same argument applies in applying a remedy simply because that defendant did not separately brief it. For example, if this Court were to agree with one defendant's argument that a jury instruction was erroneous, the remedy for that error would be applicable to each defendant to whom the instruction applied, whether or not he made a separate argument on that issue. The government's contention to the contrary is not well founded.

On the other hand, the government rightly cites the familiar principle that cursory arguments are waived. Even in the criminal context, perfunctory and undeveloped arguments, unsupported by pertinent authority, are waived; courts are not obligated "to research and construct the legal arguments open to parties, especially when they are represented by counsel." *United States v. Holm*, 326 F.3d 872, 877 (7th Cir. 2003) (quotation marks and citations omitted); *United States v. McLee*, 436 F.3d 751, 760 (7th Cir. 2006). Given the number of issues

before the Court, as well as the fact that each defendant is represented by two able lawyers (and the government by three), [5] this rule has been enforced against both sides.

## I.      Rule 29 Motions for Judgment of Acquittal

Every defendant raises a challenge to the sufficiency of evidence against him. After a jury's guilty verdict, a criminal defendant seeking a judgment of acquittal under Rule 29 faces a hurdle that the Seventh Circuit has deemed "nearly insurmountable." *See United States v. Jones*, 713 F.3d 336, 339 (7th Cir. 2013). Nevertheless, it is not "wholly insurmountable," and because the government bears the burden of proof, "the height of the hurdle depends directly on the strength of the government's evidence." *Id*. If the evidence is insufficient to sustain the conviction, this Court must grant a motion for judgment of acquittal. *See id*. at 339-40. In considering a Rule 29 motion, this Court views the evidence in the light most favorable to the government, and the verdict will be overturned only if no rational trier of fact could have found beyond a reasonable doubt that the defendants committed the essential elements of the crime. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Genova,* 333 F.3d 750, 757 (7th Cir. 2003) ("Rule 29(c) does not authorize the judge to play thirteenth juror.").

---

[5] On a related note, the official transcript of the trial alone (excluding myriad other hearings) comprises 13,612 pages in 62 volumes. The volume numbers exist for a purpose. Unfortunately, due to the parties' failure to cite the transcripts by volume number—when they bothered to cite the transcripts at all—this Court had to relive most of the four-month trial to ferret out the pages cited. The government and every defendant—except Paris Poe, whose counsel are commended—are guilty of this imprecision, and it is both inexcusable and detrimental to the parties' arguments (to the extent that the Court is unable to locate the testimony bearing on a party's fact assertions). For future reference, the format for citing trial transcripts is handily available in the "Quick Reference" table on the interior back cover of *The Bluebook*. To understand and review the parties' arguments, the Court and staff were required to create a table that correlates page numbers to volumes; that chart is attached as an Appendix to this opinion. At the very least, this Court can spare the Court of Appeals the same wasteful exercise if any appeal arises.

The Court will not catalog all of the evidence presented over the course of the four-month trial; rather, evidence is discussed as relevant to and only in the detail required to address the defendants' arguments about its sufficiency. The government summarizes much of the evidence in its consolidated response, *see* Government's Consolidated Response Brief 2 – 67, ECF No. 1207 ("Resp."), and the three defendants who filed reply briefs did not challenge the recounting of the evidence (nor did those who declined to reply). This is not to say that the Court accepts the government's summary uncritically, and deviations from the record will be noted if needed.

A.    **Count One: The RICO Conspiracy (All Defendants)**[6]

Each trial defendant argues that the government lacked sufficient evidence to prove the existence of a racketeering conspiracy and his participation in it. Arguments of this nature were addressed in rulings on motions to dismiss before trial, as well as in ruling on objections the government's *Santiago* proffer. *See* Order 4 *et seq*, ECF No. 560; Order 3 *et seq*., ECF No. 782. In both contexts, this Court held that the government had, based on the applicable standard, sufficiently alleged and proffered evidence of the existence of a conspiracy, and the trial defendants' knowing participation. The government's burden at trial, however, is proof beyond a reasonable doubt, so those rulings must be revisited now that the full body of admitted evidence is before the Court.

Count One of the Superseding Indictment, ECF No. 169, charged the defendants with conspiracy to engage in a racketeering enterprise known as the Hobos, in violation of 18 U.S.C. § 1962(d). Each defendant was alleged to have agreed to conduct and participate in the affairs of an enterprise through a pattern of racketeering acts including drug trafficking, home invasions,

---

[6] This Section addresses only the sufficiency of the evidence against the defendants on Count One, and not with respect to the Additional Findings as to specific racketeering acts. Although those findings relate to Count One, they are discussed in the sections that follow, in the context of the specific acts underlying the Findings, to better provide context.

robberies, shootings, and murders. The indictment alleges that the enterprise in question is the Hobos, "that is, a group of individuals associated in fact." SI ¶ 2.

Under RICO, it is illegal for a person "associated with any enterprise...to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c); *United States v. Volpendesto*, 746 F.3d 273, 283-84 (7th Cir. 2014). The RICO statute, 18 U.S.C. § 1962(d), also prohibits conspiracy to commit a violation of its substantive provisions. *Volpendesto*, 746 F.3d at 284. In other words, the goal of a RICO conspiracy is a violation of RICO. *United States v. Garcia*, 754 F.3d 460, 482 (7th Cir. 2014). To prove a RICO conspiracy, the government must show (1) an agreement to conduct or participate in the affairs (2) of an enterprise (3) through a pattern of racketeering activity. *United States v. Olson,* 450 F.3d 655, 664 (7th Cir. 2006).

### 1. Existence of a "Hobos" Enterprise

All defendants contend that there was insufficient evidence to prove beyond a reasonable doubt that an "enterprise" known as the Hobos existed. The Supreme Court has defined an enterprise associated in fact as "simply a continuing unit that functions with a common purpose." *Boyle v. United States*, 556 U.S. 938, 948 (2009). The absence of the structural attributes of a more formal enterprise is not material. *United States v. Olson*, 450 F.3d 655, 664 (7th Cir. 2006) ("We have held that in informal organizations such as criminal groups, there 'must be some structure, to distinguish an enterprise from a mere conspiracy, but there need not be much.'").

An enterprise includes "any union or group of individuals associated in fact," which is to say, "associated together for a common purpose of engaging in a course of conduct." *Boyle v. United States*, 556 U.S. 938, 944 (2009) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)); *Volpendesto*, 746 F.3d at 284. The purpose may be illegitimate. *Turkette*, 452 U.S. at

587. What is required is "at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle*, 556 U.S. at 946; *United States v. Hosseini*, 679 F.3d 544, 558 (7th Cir. 2012) (RICO enterprise requires purpose, relationships, and longevity).

As the defendants argue, the "enterprise" cannot be defined coextensively with the "pattern of racketeering activity," lest the two statutory elements collapse into one. "The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct. The pattern of racketeering activity is, on the other hand, a series of criminal acts as defined by the statute." *Turkette*, 452 U.S. at 583. "The existence of an enterprise at all times remains a separate element." *Id.* However, the enterprise does *not* have to have a purpose that is different than carrying out a pattern of racketeering activity (that is, violating RICO's substantive provisions).

The defendants' argument that a reasonable jury could not have concluded that "The Hobos" existed as an association-in-fact enterprise lacks merit. They focus on the lack of structure, rules, profit-sharing, or a coordinated drug trafficking operation, among other things. These carefully selected attributes are certainly relevant to the existence of a criminal enterprise, but they are not necessary. As in *United States v. Phillips*, 239 F.3d 829 (7th Cir. 2001), the defendants unpersuasively argue that the evidence showed nothing more than that they were a group of individuals who occasionally committed crimes together, not an "enterprise." Ignoring considerable evidence, they say that all the government showed was that they engaged in "accidentally parallel action." *See Volpendesto*, 746 F.3d at 284 (finding it "highly implausible" that defendants' criminal acts were simply "accidentally parallel action"). The evidence of an "enterprise," however, was more than sufficient.

First, several witnesses, including Hobos insiders and enemies, testified that the Hobos were a gang. William Ford, in a secretly recorded conversation with Hobo-turned-cooperator Chad Todd, discussed how "we" were "the hottest gang" of the moment. *See* Ford Tr. 4860GT[7] at 20. Ford also referred to his "squad" as the Hobo Dirty Low. Ford Tr. 4860BT at 1-2. He talked about his and Todd's rank "in an organization." Ford. Tr. 4860CT at 2.

Chad Todd and Rodney Jones were each Hobos before cooperating against them; their testimony that the Hobos existed and that they were members is competent evidence of that organization's existence. *See* Todd Test., Trial Tr. Vol. 20 at 4872; Jones Test., Trial Tr. Vol. 32 at 7402. Todd testified that he received Bush's and Council's "blessing" to call himself a Hobo in 2007. Trial Tr. Vol. 20 at 4873. Jones, of the "Met Boy," faction, also became a Hobo sometime in 2006 after starting to sell drugs for and committing crimes with "people that was Hobos." Trial Tr. Vol. 32 at 7419, 7421.

Todd considered other Dirty Lows like Derrick Vaughn and William Ford to be Hobos. Trial Tr. Vol. 20 at 4877. He considered Gregory Chester a Hobo, id. at 4895, and "the leader," while Council, Bush, and Poe had "positions of authority," *id*. 4907. At some point, Todd also considered the "Met Boys" to be Hobos, after they began selling drugs for Arnold Council. Id. at 4914. Jones testified that Arnold Council was a Hobo. Trial Tr. Vol. 32 at 7388. So were Fat Shorty, *id*. at 7406, Bush, Derrick Vaughn, and William Ford, *id*. at 7415, 7424, 7477, as were Arnold Council and Gregory Chester, *see id*., among others.

Another Hobo, Kenneth Bland, confirmed the existence of the Hobos by testifying that "Fat Shorty" (Alonzo Cole) "was one of the Hobos," Trial Tr. Vol. 36 at 8477, as were Arnold Council, Paris Poe, Rodney Jones, the Brown twins, and "Chee" (Gary Chester), *id*. at 8481,

---

[7] The transcript citations in this paragraph correspond to the audiotapes in evidence as Gov. Exs. 4860G, 4860B, and 4860C, respectively.

8510, 8518, 8520, 8559. Bland himself (originally a Gangster Disciple eventually became "part of another gang"—the Hobos. *Id*. at 8480. Kevin Montgomery, an associate of Gabriel Bush, also testified that the Hobos were a gang. He testified that Arnold Council was part of a "group or organization" called the Hobos. Trial Tr. Vol. 8 at 1805. Montgomery said that he himself was not a Hobo. *Id*. at 2023; Trial Tr. Vol. 9 at 2156. Marcus Morgan testified that at one point Poe told him that he was not ready to "be down with . . . their gang," which he knew meant "the Hobos." Trial Tr. Vol. 15 at 3691.

Cashell Williams, a member of the Fifth Ward faction of the Black Disciples, testified that the Fifth Ward and New Town (an allied faction) BD's were in a conflict with the Dirty Low and the Hobos in September 2007. Trial Tr. Vol. 29 at 6839. Williams testified that the Hobos included "Joe Buck [William Ford], Poe, a few more dudes." *Id*. at 6842. Courtney Johnson, a Mickey Cobra, testified that his gang was in a conflict with a "group" called the Hobos in August 2007. Trial Tr. Vol. 27 at 6389.

In sum, witnesses from inside and outside the group testified that the Hobos were a distinct and identifiable group of people—in other words, an association-in-fact. The jury was entitled to credit one or more of these witnesses, which is all that was needed for there to be sufficient proof of the existence of an association-in-fact known as the Hobos.

Second, the defendants are simply wrong to suggest that there is no evidence of the cherry-picked characteristics that they say were not proved about the Hobos, such as a hierarchy, profit sharing, rules, and more. The government proved a structure, albeit loose, of the Hobos gang. *See* pp. 26-27 *infra*. According to cooperating witnesses, and Chester's own statement to police on October 22, 2008, Chester was the chief "breadwinner" of the Hobos, and a founding member. Paris Poe ranked "below" Chester, according to the evidence, because he served as a

protector or bodyguard to Chester at times; he protected Chester during a shoot-out at a carwash, and he committed at least one murder in order to protect Chester from prosecution. Gabriel Bush and Arnold Council were shown to have leadership roles in various ways. They each recruited younger members of the Hobos: Council folded in Met Boys Byron and Brandon Brown and Rodney Jones, while Gabriel Bush brought Chad Todd into the Hobos. They planned major undertakings such as the coordinated drive-by shooting of Antonio "Beans" Bluitt and Gregory "Slappo" Neeley. The younger members of the gang assisted with, rather than led, drug operations, obtaining the drugs from Bush and Council, among others. Likewise, mid-grade Hobos such as William Ford and Derrick Vaughn (as well as uncharged Hobos associates such as Kevin Montgomery) worked in drug lines that were overseen by higher-ranking Hobos. William Ford specifically referred to a "totem pole" and the Hobos' "ranks" in conversation with Chad Todd. These hierarchical relationships, although not memorialized with titles as in some gangs, show an informal structure to the gang.

A finding of informal sharing of wealth, if not "profit sharing" among the Hobos could also have been made by the jury. When a robbery occurred, proceeds were allocated among those who directly participated and those who did surveillance in advance. The defendants, Poe in particular, say this is meaningless because all criminals divide up robbery proceeds. But that is not the only permissible inference from the evidence. It was also reasonable to conclude that the organizers paid subordinates, especially because "surveillance" was often done by Hobos who did not ultimately participate in the crime. Moreover, drug money was spread around, as were firearms. Younger Hobos were treated to shopping sprees, occasional cash payments (not loans), or distributable quantities of drugs; incarcerated Hobos were financially supported by those on the outside, and newly released Hobos received payments or gifts. As there is no record evidence

of any Hobos being legitimately employed, the jury certainly could have inferred that financial support among members was part of the Hobos' creed. Perhaps this is not a formal system of "profit sharing" that Poe would require, but the pooling of resources such as money and firearms is amply supported by the record.

Further, there was sufficient evidence that the Hobos' drug trafficking operations were not, as the defendants claim, entirely separate from each other. The trial record established that Gregory Chester was a major purchaser of large quantities of heroin, and yet he was not dealing drugs himself; he sold wholesale quantities to other Hobos, including Council, Bush, and Keith Daniels. On at least one occasion, Ford conducted surveillance with Chester on a Mexican drug importer for the purpose of stealing a large stash. Arnold Council provided sale quantities of drugs to the "Met Boys" Hobos to sell at 51st Street and Calumet Avenue, and Bush did the same for Brandon Brown.

The Hobos also controlled a handful of distinctly branded, lucrative drug lines, including "Cash Money" (heroin); X-Men (crack); "Pink Panther" (crack, heroin, and marijuana); "Blue Line" (crack). Bush managed the Cash Money and X-Men lines, supplying the drugs and receiving the proceeds, although leaving the street-level transactions to others. Pink Panther and Blue line were Council's operations. Other Hobos and Hobos associates operated these drug lines, collected the money, and provided armed security. They included Ford, who managed "Cash Money" drug spots for Bush, Alonzo Cole, who operated a Pink Panther line at 4429 South Federal Street, and Kevin Montgomery, who was Bush's money collector. Stanley Vaughn helped secure the area of 47th Street and Vincennes Avenue for the Dirty Low, where Gabriel Bush later operated drug lines, running them with help from William Ford and Derrick Vaughn.

There was also evidence that Council and Bush occasionally used the same apartment to mix and package drugs to sell, that younger Hobos provided armed security for the transport of drugs or drug proceeds, and that, on several occasions, different Hobos were arrested together and separately in possession of drugs, or for selling drugs to confidential informants in the known Hobos territories. Finally, Gregory Chester provided distribution quantities of heroin to other Hobos on several occasions, including the three controlled transactions with informant Keith Daniels. These drug-related associations among the defendants, coupled with the evidence that drug trafficking was at the core of each trial defendant's livelihood, provided solid evidence of an association-in-fact. The jury could even have concluded, reasonably, that the breadth of the drug activity evinced the Hobos' wide sphere of power and influence, not a lack of connectivity.

Also probative of a link among the members of the Hobos was their willingness to protect each other and retaliate on behalf of each other. The most obvious example is the involvement of every trial defendant other than Poe in the murder of Antonio Bluitt (which also turned out to be the murder of Gregory Neeley and the attempted murder of Cashell Williams and Roosevelt Walker). Bluitt was suspected of being responsible for Chester being shot, and within days, Gabriel Bush and Arnold Council were planning a response and, the jury could have believed, offering a cash reward for Bluitt's murder (either at their own initiative or at the behest of Chester). The shooting of Chester also ignited an all-out war with the New Town and Fifth Ward Black Disciples. In quick succession after the shooting of Chester on June 3, 2007, the Hobos targeted Andre Simmons ("Diamond Dre") in a drive-by shooting perpetrated by Bush, Council, Ford, and Todd. On June 27, Bush, Derrick Vaughn, Chad Todd and others shot Jonte Robinson in New Town Black Disciple territory. On July 9, 2007, Bush and Ford shot the minors Lee Turner and Marvin Dickerson in Fifth Ward Black Disciple territory. On August 27, Bush

and Jones participated in the shooting of Bluitt's close associate, Eddie Jones. Days later came the Bluitt murder.[8] These attacks on the New Town Black Disciples, the gang believed to be behind Chester's shooting, took place shortly after that shooting. Coincidence? The jury need not have believed so.

Rodney Jones was also given the loyalty treatment. When he was shot by members of the Row Row Gangster Disciples, he was visited by Bush, Council, Ford and the Brown twins, something hardly indicative of a random assortment of individuals who occasionally committed crimes together. Council later obliged Jones with a powerful semi-automatic handgun to use for retaliation against suspected associates of his assailants. The Hobos also protected each other by surveilling scenes during robberies and providing armed security for each other.

Many other crimes the government proved showed relationships among various Hobos that supports the existence of an enterprise as opposed to a mere "group of individuals" who sometimes committed crimes together (crimes that were, according to the defendants, all outside the scope of the conspiracy and completely unrelated to each other). Council committed the Wilbert Moore murder with Poe (with a tip from Bush), and another murder (of Anderson) with Bush. Council and Poe robbed Bobby Simmons, and then led him on a wild car chase through the streets of Chicago, punctuated at frequent intervals by gunfire from the Hobos' car. William Ford protected Arnold Council from apprehension by using his car to block police officers. Poe committed a home invasion with Gary (not Gregory) Chester (also known as "Chee," and

---

[8] Gabriel Bush's contention that the Bluitt/Neeley murder was "the only incident which appears to have a relationship between and among various participants," and "bears no relation to . . . any other alleged violent act," Bush Mot. 7, ECF No. 1189, is beyond the pale in its misrepresentation of the evidence at trial. If believed, the government's evidence showed an interconnected web of criminal activity and collaboration among various combinations of the defendants that make the Bluitt/Neeley murder just another day at the office for these defendants. At any rate, Bush himself betrays the connections among the defendants by repeatedly referring to them as a "*group*." Bush Mot. 5, 9, ECF No. 1189.

"Benson"—because he frequently served as Gregory Chester's driver), another indicted Hobo (who pled guilty before trial).[9] After Stanley Vaughn took over the area from the Black Disciples, Derrick Vaughn and William Ford each sold drugs in the same territory at 47th & Vincennes, an unlikely occurrence if the two were not part of the same gang and sharing territory. Ford and Council were among the Hobos who robbed party-goers of jewelry at a carwash in 2008. And in the cars used for the drive-by murders of Bluitt and Neeley were Ford, Derrick (and Stanley) Vaughn, Bush, Council, and Brandon Brown. Given the web of crimes connecting the trial defendants with each other (of which the foregoing is only a partial summary), and common associates, the idea that these crimes were all unrelated, and that the defendants were not associated with one another, was not one the jury must have accepted.

Further, the Hobos group had a number of common practices and procedures that support the existence of an association-in-fact. The Hobos had a reputation for using, and indeed characteristically used, high-powered firearms with extended clips and semi-automatic capabilities. They shared the weapons, too; the government's evidence linked several guns used in different criminal episodes committed by different Hobos, providing compelling evidence that the group shared their considerable firepower. The Hobos frequently rented cars—sometimes for just hours—for use during shootings and other crimes, although there was plentiful evidence that Hobos including Chester, Council, and especially Bush had fleets of their own cars (very expensive cars, at that). The Hobos also had a *modus operandi* of using visual surveillance teams to plan and protect burglaries and using police scanners to evade capture after crimes.

Also suggestive of an association-in-fact: at least four of the trial defendants—Chester, Poe, Council, and Ford—had tattoos referring to the Hobos (or so the jury could have

---

[9] The jury, of course, was not privy to the fact that Gary Chester had been indicted or pled guilty; the evidence admitted showed, however, that he was a member of the Hobos.

concluded). At least two Hobos had "Hobo" embroidered on the headrests of their cars. Hobos used a hand sign, as documented in photographs put in evidence. They called each other "Hobo" and used expressions such as "on Hobo" (functionally equivalent, the evidence suggested, to an oath made to the memory of "me dearly departed mother"). The jury might have believed that these "Hobo" invocations all related to a deceased friend and mentor who went by that name, as Chester and others maintain, but it was not required to; instead, they concluded, reasonably, that there was an enterprise known as the Hobos to which these defendants pledged fealty.

The Hobos were also defined by what they were *not*. The Hobos included members who began as Gangster Disciples (including the Dirty Low faction), Met Boys, and Black Disciples. The coalescence of different factions and gangs was unusual, but the coalition was not universal. Over time, the trial evidence showed, the Hobos were "into it," or at war with, other gang factions including the Fifth Ward Black Disciples, the New Town Black Disciples, the Mickey Cobras, and the Row-Row Gangster Disciples. The Hobos united as a group against these gangs and factions, targeting them for robberies and shootings. This unity against outside rivals suggests that the Hobos were a group, not unrelated individuals. Or at least the jury could have concluded as much.

In light of this other evidence, the absence of a written constitution or rules, formal titles and ranks for members, formal induction of new members, and punishment for "violations" perhaps distinguished the Hobos from some other street gangs, but does not render a jury finding that the Hobos formed an enterprise unreasonable. These are traits of an entity that is defined by common interests, characteristics, and allegiances, not simply by the assortment of criminal acts that members committed over time.

## 2.    Participation In and Furtherance of the Enterprise

The defendants also say that that the government failed to prove their respective participation in the enterprise. To prove participation, there must be proof that the conspirators were "aware of the essential nature and scope of the enterprise and intended to participate in it." *Olson,* 450 F.3d at 664 (quoting *United States v. Useni*, 516 F.3d 634, 646 (7th Cir. 2008)). In other words, "one must knowingly agree to facilitate the activities of those who are operating an enterprise." *Useni*, 516 F.3d at 646 (7th Cir. 2008). The actual participation of any defendant in any particular racketeering act is irrelevant. "To prove primary liability for a RICO conspiracy under section 1962(d), the government must prove only that a particular defendant agreed that *a* member of the conspiracy would commit two predicate racketeering acts, not that the particular defendant committed or agreed to commit two predicate acts himself." *United States v. Benabe*, 654 F.3d 753, 776 (7th Cir. 2011) (emphasis in original). Indeed, a § 1962(d) conspiracy charge "does not require proof that the defendant committed two predicate acts of racketeering, that he agreed to commit two predicate acts, or, for that matter, that any such acts were ultimately committed by anyone." *United States v. Tello*, 687 F.3d 785, 792 (7th Cir. 2012) (internal citations omitted). Thus, the only individual "participation" at issue is the agreement that a member or members of the enterprise would commit at least two racketeering acts and the awareness of the general contours of the conspiracy. *United States v. Amaya*, 828 F.3d 518, 531 (7th Cir. 2016). Here, a defendant "can prevail only if no rational juror could have found that he was part of, or agreed to facilitate, the activities" of the Hobos. *See United States v. Garcia*, 754 F.3d 460, 477 (7th Cir. 2014).

The evidence of an enterprise summarized above highlights the interconnected web of criminal activity that was suggestive of an enterprise, and given the repeat players and

characteristic behavior of the Hobos, the jury also had grounds for concluding that these defendants were aware of nature and scope of the enterprise. There was also the direct testimony from a number of witnesses that these defendants were Hobos. The jury could have reasonably determined that each defendant understood, at a minimum, that the Hobos would engage in drug trafficking, murders, retaliation, and robberies for common purposes including enrichment and increased status.[10] The element of "knowing participation" was established with sufficient evidence that each trial defendant personally participated in two or more racketeering acts— something that goes far beyond the minimum standard of showing that a defendant agreed that ***any*** participant would commit two acts.

Examples of the acts as to which there was sufficient evidence of the respective participation of individual defendants abound. Gregory Chester was, he admitted himself (either at trial, in statements made to police, or both), the Hobos' most successful drug dealer, and was involved in robberies of drug dealers, drug sales to Keith Daniels, and Daniels' subsequent murder. Arnold Council assisted in the Terrance Anderson murder, murdered Wilbert Moore, and participated in an armed robbery of a clothing store in which he aided and abetted the brandishing of a firearm. Gabriel Bush facilitated the murder of Wilbert Moore; engaged in extensive drug trafficking; shot Andre and Darnell Simmons, Lee Turner and Marvin Dickerson; and killed Terrance Anderson, Antonio Bluitt, and Gregory Neeley. Paris Poe murdered Wilbert Moore and Keith Daniels. William Ford dealt crack cocaine and participated in the drive-by shooting of Bluitt, Neeley, Williams, and Walker, as well as the shooting of Darnell and Andre

---

[10] This is one of the reasons that many of the out-of-court statements by members of the Hobos were admissible as coconspirator statements in furtherance of the conspiracy: they showed that members of the conspiracy talked about their past and future criminal plans and advised each other of what sorts of criminal activity had been, and would be, afoot. *See, e.g, United States v. Rea*, 621 F.3d 595, 605 (7th Cir. 2010); *United States v. Alviar*, 573 F.3d 526, 545 (7th Cir. 2009); *United States v. Doyle*, 771 F.2d 250, 256 (7th Cir. 1985).

Simmons. Derrick Vaughn also dealt crack cocaine and participated in the funeral home shooting of Bluitt and his associates, as well as the shootings of Devin Seats and Jonte Robinson. These examples are simply representative acts of which there was sufficient evidence to conclude that the respective defendants knowingly participated and from which the jury reasonably could have concluded that the defendants all agreed to further goals of the conspiracy through the commission of racketeering acts by a member.

Gabriel Bush contends that the criminal activities were not proved to be connected to the "affairs of the enterprise" or any common purpose; instead, all the robberies, shootings, murders, home invasions, and drug trafficking offenses discussed at trial were "random criminal acts." Bush Mot. 7, ECF No. 1189. The dubious "random" nature of the acts, given the web of relationships among the Hobos, has been addressed already, but to be clear, the evidence was also sufficient to establish that the criminal activity was calculated to advance the common goals of the enterprise. The government presented substantial evidence of the accumulation of wealth by the Hobos, particularly the senior members. None had legitimate employment and yet there were group vacations (some paid for entirely by Gabriel Bush alone), fleets of vehicles, expensive jewelry and designer clothes, and other trappings of substantial wealth displayed by the co-conspirators. The accumulation of reputation and status through crime was also borne out. William Ford himself described how the Hobos were "one of the hottest gangs right now." *See* Ford Tr. 4860GT at 20 ("We living up to our street creds.").[11] And again, the flashy displays of wealth such as cars and jewelry evince outward attempts to impress and demonstrate status. The same could reasonably inferred from the brazen nature of some of the criminal activity; for example, robbing people *en masse* at a carwash party; stealing a unique and expensive pendant

---

[11] The transcript corresponds to the jailhouse recording evidence at Gov. Ex. 4860G.

from a high-profile NBA player near a crowded nightclub; or shooting at Antonio ("Beans") Bluitt and three associates outside a funeral service; at Darnell and Andre Simmons (associated by the Hobos with the New Town Black Disciples) in their car; at the minors Lee Turner and Marvin Dickerson (associated by the Hobos with the Fifth Ward Black Disciples) on the sidewalk; at Jonte Robinson (associated by the Hobos with the New Town Black Disciples) outside his child's daycare; at Eddie Jones (a close friend of Antonio Bluitt) outside his home; at Devin Seats (a Fifth Ward Black Disciple ) leaving a T-shirt shop; and at Wilbert "Fat Shorty" Moore (a cooperator), all in public, often in broad daylight—with little or no effort to conceal the shootings except from law enforcement, after the fact. Bush and his codefendants are far off-base in arguing that there was no evidence from which a reasonable jury could infer that the defendants acted with common purposes and to further the enterprise's goals of accumulating wealth and "street cred."

The defendants' further individualized arguments about the proof of their participation in the enterprise are addressed below.

### a.    Gregory Chester as Leader

Chester contends that the government's only theory of his participation was that he was a "leader," but it did no more than prove there was a "rumor on the street" that Chester "was the leader of the Hobos" although there was "no evidence" supporting that rumor. Chester Mot. 11, ECF No. 1192. Whether Chester was the "leader" of the Hobos, of course, is a red herring—he need not be the leader of the enterprise to be guilty of the charged conspiracy. Whether the evidence about Chester's participation in the conspiracy warranted labeling him the leader of the Hobos is beside the point, as it nevertheless established his participation in the conspiracy.

That said, there is certainly sufficient evidence from which the jurors could have concluded that Chester was the leader of the Hobos. William Ford and Chad Todd discussed a "totem pole" with Chester at the top, and quibbled over the "rank" of the others. Tr. 4860C at 2-5.[12] Todd testified that he considered Chester the "leader." Trial Tr. Vol. 20 at 4895. So did Rodney Jones. Trial Tr. Vol. 34 at 8128. Keith Daniels, a Hobo-turned-informant, said that Chester was the "leader" while Council, Poe, and Bush were "under him" and of "equal rank." Trial Tr. Vol. 45 at 10519-10520. Chester denigrates the cooperating witnesses who identified as Hobos, contending that "even" they "could not point to any actual evidence." Chester Mot. 11, ECF No. 1192. However, their testimony *is* evidence. If a self-described Hobo or Hobo associate testified that Chester was a part of, and the leader of, the Hobos, this is probative evidence that the jury could reasonably credit.

What is more, Chester was among those who identified him as a leader of the Hobos. In his police interview on October 22, 2008, Chester called himself the most influential member of the Hobos, and the group's most successful drug dealer and main "breadwinner." Trial Tr. Vol. 4 at 804. Chester also does not address any of the acts that fit with him not only being a drug dealer, but one who obtained drugs for the Hobos (Chester, for example, testified about having a steady source for distribution quantities of very pure heroin).

Chester similarly ignores the evidence relating to the retaliation by the Hobos after he was shot 19 times in New Town Black Disciple Territory in June 2007. There was ample evidence that the Bluitt and Neeley murders were carried out as retaliation for that shooting. After the shooting of Chester, on at least two occasions before the funeral home drive-by shooting, different Hobos surveilled Bluitt with an eye toward killing him. The evidence showed

---

[12] The transcript corresponds to the recording in evidence as Gov. Ex. 4860C.

that Bush, Council, Ford, and Jones, at a minimum, linked the killing of Beans to the attack on Chester. Trial Tr. Vol. 21 at 5108, 5111; Vol. 30 at 7500-7505; Ford Tr. 4860B at 6.[13] The massive retaliation could reasonably be taken as evidence of Chester's status in the Hobos.

So too could the evidence that Chester took care of Hobos when they came out of prison, giving them drugs, money, clothing, and/or cars to facilitate their re-entry. And there was also, of course, the evidence of Chester's Hobo tattoo, the most detailed and elaborate sported by the various members of the gang, and for that reason providing further reason to credit the accounts of his leadership status. In short, there was sufficient evidence from which a jury could find that Chester was a leader of the Hobos, and in any event easily suffices to show that he agreed to participate in the Hobos enterprise through a pattern of racketeering activity. Chester focuses on the allegation that he was a "leader" without addressing any evidence that he was, at a minimum, a knowing member of the conspiracy.

Finally, on this and all other issues as to which Chester disputes the sufficiency of the evidence, it is important to note that Chester testified at trial, broadly asserting that the Hobos did not exist and were not a gang and that "Hobo" was one person, a deceased friend. *See* Trial Tr. Vol. 47 at 11163, 11203; Vol. 48 at 11342. He also flatly denied having called himself "the most influential" member or the "breadwinner." Trial Tr. Vol. 48 at 11329. He said he told the FBI (Agent Bryant Hill) that "I don't know nothing about no Hobos, no robberies, no shootings, no murders, no nothing." Trial Tr. Vol. 48 at 11343. In so testifying, Chester put his own credibility on the line and the jurors, of course, were free to assess the credibility of his testimony just as they did all of the other witnesses at trial. By testifying, Chester gave the jurors the opportunity to conclude that he was lying to them, and their verdict reflects that they so concluded. And if the

---

[13] The transcript corresponds to the exhibit in evidence as Gov. Ex. 4860B.

jury disbelieved Chester, "it was further entitled to consider whatever it concluded to be perjured testimony as affirmative evidence of guilt." *Wright v. West*, 505 U.S. 277, 296 (1992) (citing *Wilson v. United States,* 162 U.S. 613, 620-21 (1986); *United States v. Zafiro,* 945 F.2d 881, 888 (7th Cir. 1991); *Dyer v. MacDougall,* 201 F.2d 265, 269 (2d Cir. 1952) (L. Hand, J.)). *See also, e.g.*, *United States v. Jocic*, 207 F.3d 889, 893 (7th Cir. 2000) ("When a defendant decides to testify and deny the charges against him and the finder of fact thinks he is lying, his untruthful testimony becomes evidence of guilt to add to the other evidence."). To the mix of evidence that convinced the jury of his guilt, then, must be added Chester's own testimony.

**b.      Absence of Hierarchy Generally**

Defendant Poe (as well as Bush and others) argues, among other grounds for acquittal on Count One, that the government failed to prove Poe's alleged place in the Hobos hierarchy as depicted in a demonstrative chart used during the trial. Poe Mot. 3, ECF No. 1188.  First, that chart was not evidence, nor did it purport to summarize evidence. Second, the government did not argue that the photos underneath Poe depicted gang members under his control or who committed crimes "as Poe's subordinates," although it certainly argued that Poe, Bush and Council were higher in the pecking order than Hobos other than Chester. Finally, the entire argument, like the "Chester was not the leader" argument, misses the point. The government did not have to prove that Poe had a defined position in the hierarchy; the existence association-in-fact that the government alleged did not depend on Poe's place in the pecking order. The government sought to prove, for example, that Gregory Chester was a founding Hobo and gang leader; that certain Hobos recruited, mentored, and involved younger members in the criminal activities of the gang; and that Poe was a protector of Chester's. This evidence set forth a loose structure of the enterprise, but the government did not have to prove each defendant's place

simply because its theory of the case reflected a rough hierarchy. In any event, there was evidence of a hierarchical structure, as discussed generally, *see* p. 14, *supra*, and with respect to Chester, *see* pp. 24-25, *supra*. To that evidence can be added still more evidence that Poe overlooks, including: the recorded conversation between Hobos Ford and Chad Todd about the "echelons" of members and the "rank" of individual members, Kenneth Bland's testimony that Arnold Council was "higher up" than he was in the Hobos gang, to the point where he ended a dispute with a rival named "Go Go" at Arnold Council's direction. The evidence was sufficient to show both that there was a loose hierarchy within the Hobos enterprise and that Poe occupied a position near the top of that hierarchy, but even if he did not, that would not provide a basis for acquittal.

### 3. Other Count One Arguments

#### a. Continuity and Timeliness

Certain defendants raise the argument that, whatever their participation in the Hobos enterprise (assuming its existence for the sake of argument), the government failed to prove that their participation continued into the limitations period, or relatedly, that the enterprise had the required element of continuity. *See* Bush Mot. 8-11, ECF No. 1189. No defendant, however, develops an argument for reconsideration of the Court's pretrial rulings on this subject. Specifically, the Court addressed these arguments in its rulings on motions to dismiss, *see* Order, ECF No. 560 (ruling on Motion ECF No. 327); and motions for severance of Poe and/or Count Six, *see* Order, ECF No. 564 (ruling on Motions at ECF Nos. 341 and 350). The Court is given no reason to depart from its original analysis, which the defendants do not mention, let alone substantively address. "It is the defendant's burden to prove that he withdrew from the conspiracy." *See United States v. Nagelvoort*, 856 F.3d 1117, 1128 (7th Cir. 2017). Otherwise,

the conspiracy is presumed to continue. *See United States v. Vivit*, 214 F.3d 908, 918 (7th Cir. 2000) (conspiracy continues for statute-of-limitation purposes so long as any action is taken in furtherance of the conspiracy). No defendant proved withdrawal from the conspiracy before 2013, and the jury need not have inferred from the evidence that the Hobos ceased to operate in 2008 or so.

Defendant Bush would have it that without more examples of predicate crimes within the five-year limitations period, the charges were untimely. That is not the law; there is no quantum of predicate acts that must occur within the limitations period. Moreover, in advancing this argument, Bush sets apart the most recent enumerated crimes in the indictment—the Castro home invasion, the Collections store robbery, and the murder of Keith Daniels—from any "enterprise" by arguing that they were each isolated events with no connection to each other. This overlaps with the argument that there was no enterprise at all, and that argument is addressed elsewhere, but notably, Bush says all these crimes have in common is that "a few of the persons once associated with the Hobos were involved." Nothing backs up the "once associated with" descriptor. In any case, Bush leaves out many other examples of ongoing racketeering activity on behalf of the enterprise beyond 2008 (when Bush went to prison), including the Chester-Daniels drug sales, William Ford's plans for a Waukegan drug operation with seed financing by Chester, and the burglary of Chad Todd's home after he was revealed as an informant.

Most importantly, however, as this Court explained previously, it does even not matter whether any of the specific predicate acts took place within the limitations period. All that matters is whether the conspiracy continued into the statutory period. *United States v. Schiro*, 679 F.3d 521, 528 (7th Cir. 2012); *United States v. Useni*, 516 F.3d 634, 655-56 (7th Cir. 2008).

Generally, "[a] conspiracy ends when its central criminal purpose has been accomplished." *United States v. McKinney*, 954 F.2d 471, 475 (7th Cir. 1992). "A conspiracy that contemplates a continuity of purpose and the continued performance of acts is presumed to exist until there has been an affirmative showing that it has terminated." *United States v. Maloney*, 71 F.3d 645, 660 (7th Cir. 1995) (citing *United States v. Elwell*, 984 F.2d 1289, 1293 (1st Cir. 1993). Incarceration—most defendants were in jail by 2013, some for years—does not prove withdrawal, because the "active" participation of any defendant is not required. *Nagelvoort*, 856 F.3d at 1129.

For all these reasons, the arguments related to the timing of the indictment and the continuity of the enterprise do not require a judgment of acquittal.

### b.    "Caution and Great Care" Witnesses

Defendants Arnold Council and Paris Poe attack the sufficiency of the evidence based upon the large amount of evidence of the "enterprise," and the defendants' respective participation, that came from cooperating witnesses who expected benefits for their testimony, who had motives to lie, and who had credibility issues of all stripes.[14] The premise cannot be denied, but does not matter.

---

[14] These witnesses were: Kevin Montgomery, Chad Todd, Courtney Johnson, Marcus Morgan, Shanice Peatry, Brian Zentmyer, Keith Daniels (who testified posthumously by way of a prior statement under oath), Cashell Williams, Kenneth Bland, and Rodney Jones. All but Peatry, who admitted to previously lying under oath, were felons who expected or had received benefits ranging from sentencing recommendations to immunity from prosecution. And like Peatry they had records of lying, and further: Todd and Jones were admitted Hobos (Todd cooperated and was not charged and Jones pleaded guilty and cooperated), and Montgomery (a Gangster Disciple) was a known associate of the Hobos. Bland also considered himself a Hobo; he was close with Defendant Council and robbed the Collections clothing store with him; Bland received immunity for his testimony in this case. Cashell Williams was a Black Disciple and shooting victim during the drive-by murder and attempted murder at the funeral home; he was granted immunity for his testimony. Courtney Johnson was a Mickey Cobra and another shooting victim (there was evidence he was shot by Rodney Jones) who had been paid to be an

The defendants' attempt to undo their convictions based upon issues of credibility is a non-starter; it is decidedly the jury's province to weigh evidence and make credibility determinations. Sufficiency arguments based upon witness credibility are all but frivolous. *See United States v. Elder*, 840 F.3d 455, 460 (7th Cir. 2016); *United States v. Johnson*, 729 F.3d 710, 716 (7th Cir. 2013); *United States v. Green*, 648 F.3d 569, 578 (7th Cir. 2011). Whatever the witnesses' credibility problems, the defendants' (and particularly, Arnold Council's) generalized challenge to their testimony is insufficient to show the testimony was "incredible as a matter of law," as would be required to overturn the verdicts. *See Green*, 648 F.3d at 578. A string of Seventh Circuit cases beginning with *United States v. Molinaro*, 877 F.2d 1341, 1347 (7th Cir. 1989) hold that a defendant can be convicted of conspiracy based on "totally uncorroborated" evidence that "comes from an admitted liar, convicted felon, large scale drug-dealing, paid government informant." *See Elder*, 840 F.3d at 460; *United States v. Pulido*, 69 F.3d 192, 206 (7th Cir. 1995). It is "particularly true" when "the jury has been properly informed through cross-examination, jury instructions, or both, about drug use, criminal background, and alternative motivation" that it is "the jury's job . . . to gauge the credibility of the witnesses and decide what inferences to draw from the evidence." *United States v. Stevenson*, 680 F.3d 854, 857 (7th Cir. 2012).

Here the jury was appropriately instructed on how to approach testimony from these witnesses. *See* "Testimony of Certain Witnesses," Final Jury Instructions at 8-10, ECF No. 1087. The jury instruction named the compromised witnesses and explained why their credibility

---

FBI informant and who had recorded several conversations with Dereck Vaughn. Morgan and Zentmyer both testified about information they learned while incarcerated with some of the defendants, hoping to receive benefits for cooperating. Morgan was a Gangster Disciple familiar with several of the defendants, and who was jailed for a short time (24 days) with Poe; he had hoped to receive a sentencing recommendation on an unrelated crime in return for his cooperation. Zentmyer was a jailhouse lawyer who advised Poe in connection with this case.

should be scrutinized. In their cross-examinations and closing arguments, the defense attorneys seized the opportunity to show the jurors that they should not believe those witnesses. The jury was not swayed, nor did it have to be as a matter of law. This was not inherently incredible testimony. For every argument the defense advanced about why these witnesses should not be believed, the prosecution offered one for why the testimony was credible. It was the jury's job to assess those arguments and decide what weight to give to the disputed testimony.

Moreover, unlike in *Molinaro*, as to many events in this case it is inaccurate to suggest that the testimony of the tainted witnesses was "uncorroborated." The defendants fail to acknowledge the myriad instances when physical or other more neutral evidence corroborated the testimony of the complained-of witnesses. The whole of the government's case did not come from informants, criminals, and perjurers; there were recorded conversations, physical and forensic evidence, ballistics, live victim testimony and identifications, statements to law enforcement by the defendants and by witnesses and victims, bank records, phone records, photographs, medical and expert testimony, and more. And of course there was the extensive testimony of the primary investigators: William Brogan of the Chicago Police Department and Bryant Hill and Alissa Ehr of the FBI, as well as legions of Chicago patrol officers, detectives, evidence technicians, forensic investigators, etc. Although they might have been "pathological and prodigious liars" in some contexts, *see* Council Mot. 7, ECF No. 1186, there was enough reason to credit the testimony offered by the "caution and great care" witnesses in this trial; that testimony did not have to be rejected by the jury as a matter of law.

**B.    Count Two (Council and Poe): Murder of Wilbert Moore in Aid of Racketeering and Related Additional Findings (Council, Poe, Bush)**

"Big Shorty," or Wilbert Moore (not to be confused with "Fat Shorty" Alonzo Cole, a Hobo), was gunned down after leaving a barbershop and trying to flee from his assailants until

they caught up with him near a van in a vacant lot. The physical evidence confirmed witness testimony that Moore was heading to his blue car, that he was shot both there and in the nearby lot, that he ran away from the assailants, that he was on the ground next to a van when he died, that there were two shooters (evinced by the two kinds of bullets and spent cartridges at the scenes), and that Moore was shot many times.

Paris Poe and Arnold Council were found guilty of committing this murder in aid of the Hobos racketeering enterprise—specifically, to retaliate against and silence Moore because they believed (correctly) that he was a source of the information used to obtain a search warrant for Council's apartment that led to the seizure of firearms and large quantities of drugs. The jury also made an Additional Finding that Gabriel Bush's racketeering conduct included the commission, or aiding and abetting, of Moore's murder. This was based on evidence that Bush spotted Moore's car and called in his location to the murderers. As to all three of these defendants, the jury made the Additional Findings that the murder was committed "because Moore was a witness in any prosecution or gave material assistance to the State of Illinois in any investigation or prosecution, either against the defendant or another person," and that it "was committed in a cold, calculated, and premeditated manner pursuant to a preconceived plan, scheme, and design to take a human life by unlawful means, creating a reasonable expectation that the death of a human being would result therefrom."

Poe argues that the three witnesses who testified about his participation in the murder lied, made inconsistent statements, and gave testimony contrary to "civilian" witness Alan Pugh, such that their testimony could not have reasonably been credited. Poe also argues that the testimony of Pugh, the primary disinterested eyewitness, was not probative of his involvement

and was, on certain points, exculpatory (for example, Pugh testified that the assailants did not have "distinguishing characteristics" whereas Poe had distinctive dreadlocks).

In brief summary, Hobo associate Kevin Montgomery, who worked for Gabriel Bush's narcotics operation, testified that he was at the barbershop with Bush when Bush made a phone call to alert someone to Moore's presence; that Council and Poe soon pulled up in a red car; and that later the same day, Bush reported to Montgomery that Moore had been killed. Trial Tr. Vol. 8 at 1923-1934. Montgomery identified the gun he saw Poe with as a .40 caliber. Rodney Jones testified that Poe described Moore's murder to him after the charges in this case were filed (Poe told him this, Jones testified, because Poe was wondering how he had been identified as one of Moore's assailants) and Jones and Poe were transported together to court; Jones mentioned details including that Moore ran away and tried to hide underneath a car. Trial Tr. Vol. 33 at 7607-7610. He also testified that Arnold Council told him (in more vulgar words than the Court will use) that he and someone else killed Moore because Moore had sent police to Council's house to have it "raided." *Id.* Marcus Morgan also testified that while Poe was jailed with him in Cook County, Poe told him about killing Moore. Trial Tr. Vol. 14 at 3561-3563. Brian Zentmyer[15] testified that Poe told him the same thing when they were jailed together in Kane County. Trial Tr. Vol. 43 at 10149-50.

The Court has already addressed as a general matter the folly of seeking acquittal based upon arguments that witnesses lacked credibility. Poe's arguments about the testimony of Montgomery, Jones, and Morgan, *see* Poe Mot. 4-9, ably highlights problems with their testimony—including Montgomery's unhelpful vantage point, Jones's motives to lie and the

---

[15] The testimony of Zentmyer, a so-called "jailhouse lawyer," about Poe's admissions were admitted only against Poe, and the jury was instructed not to consider his testimony against any other defendant.

unlikelihood that Poe would confess to an informant, and the lack of familiarity between Morgan and Poe as well as Morgan's criminal history and vague testimony. But Poe still falls well short of demonstrating a reasonable juror could not have credited some or all of this testimony (for all we know, the jurors did reject the entire testimony of one or more of these witnesses, which would still leave sufficient evidence to convict). Other witnesses and physical evidence confirmed the general picture of how the murder occurred; only one other witness had to be credited in order to find that Poe participated. The bar is not high when it comes to whom a jury might choose to believe, and this Court cannot conclude that the evidence against Poe was so incredible that it must be disregarded as a matter of law.

Council also argues that there was insufficient evidence to convict him on Count Two because: "There was no physical evidence connecting Arnold Council to the Wilbert Moore murder: no fingerprints, DNA, or ballistics matching a gun possessed by Arnold Council. The civilian who witnessed the murder,[16] Alan Pugh, viewed a lineup in which Arnold Council participated. Mr. Pugh did not identify Mr. Council as either of the persons he observed shooting and killing Wilbert Moore." Council Mot. 8, ECF No. 1186. Like Poe, Council attacks the credibility of Kevin Montgomery's testimony, both because he was not in a position to see that Council was driving the red car and because he had a strong motive to lie as he escaped being charged in this conspiracy and was facing charges for possessing a cache of firearms and ammunition in a storage locker (that was linked to Bush). He also highlights inconsistencies between Montgomery's story and Alan Pugh's. Council argues that Jones's testimony must be discredited because he reported Council's admission to authorities only after being indicted in

---

[16] The defendants, by contrast, do not dwell on Pugh's testimony that he was in his home, a third floor apartment across the street, watching through a window and not wearing his glasses when he saw the murder.

this case, showing that he simply parroted allegations from the indictment about Council's involvement. But since Jones was a charged co-conspirator, he is not likely to have provided any information to law enforcement until after he was indicted and had motive to cooperate. Again, although the Court agrees that the jury could reasonably have declined to credit the testimony of Montgomery and Jones, and perhaps it did reject some or all of their testimony, it was not required as a matter of law to reject it wholesale, or even in part.

Council next argues that the government's evidence, if believed, showed that the Moore murder was committed with only the motive of "personal revenge" and as "payback for Moore being the informant on a search warrant" for Council's apartment. Council Mot. 11, ECF No. 1186. It was not, therefore, for the purpose of maintaining or increasing his position in the enterprise. The argument is weak. It is possible that Council had the added personal motive to kill Moore, but the seizure of drugs and weapons from his home hurt the whole enterprise, or so the jury could have reasonably found, and maintaining or advancing his position in the Hobos need not have been his sole purpose. Moreover, it is inaccurate to say that the government "took the position that the motive . . . was one of personal revenge." There was no evidence or argument that Bush or Poe had a personal motive to harm Moore; their involvement strongly suggests that Council was acting on behalf of the Hobos and not just himself.

Council also argues that there was insufficient evidence that Moore had even cooperated against Council at all, calling into question his supposed motive for the murder. This argument was fully vetted at a *Franks* hearing on the subject of whether the search warrant for Council's apartment was based on false information. The Court took evidence and ruled that Council did not meet his burden. Order 4-10, ECF No. 738. Council provides no reason to reconsider that analysis.

Finally, Council (in an argument equally applicable to Poe and Bush) challenges the sufficiency of the evidence for the Additional Findings on the Moore murder—again, that the murder was motivated by Moore's cooperation with law enforcement, and that it was committed in a cold, calculated, and premeditated manner. Council barely develops these arguments, relying for the former on arguments made elsewhere and for the latter on conclusory statements with no citations to authority. *See* Council Mot. 16-17, ECF No. 1186. Poe does not develop any argument about the Additional Findings (*see* Poe Mot. 4 n.1, ECF No. 1188), and Bush does not mention them, although his brief incorporates all relevant arguments of his co-defendants.

For clarity, this Court holds that there was sufficient evidence to support the jury's finding that Moore was murdered for cooperating with local law enforcement by providing the factual basis for a search warrant for Council's apartment. Retaliation against informants was part of the Hobos' creed (Kevin Montgomery was threatened for doing so when he testified against Bush in a murder prosecution; Keith Daniels was murdered.) There was evidence that Council told Jones that Moore was killed for causing the police to "raid" his apartment, and that Poe told a cell mate, Brian Zentmyer, the same, *see* Trial Tr. Vol. 43 at 10150.[17] Finally, as Council's *Franks* hearing established, there was sufficient evidence supporting the conclusion that Moore had in fact acted as an informant and supplied the basis for the search warrant.

---

[17] It bears noting that Zentmyer, the jailhouse lawyer, testified that Poe did ***not*** tell him who his accomplice in murdering Moore had been. *Id.* This is one of many occasions when "caution and great care" witnesses acknowledged having limited information, which the jury could have reasonably taken as an indication of their truthfulness (had they been the pathological liars depicted by defense counsel, the jurors could have concluded, they would have falsely implicated defendants at every opportunity). Zentmyer's lack of knowledge concerning Council's identity as Poe's accomplice, moreover, casts doubt on Poe's argument at trial that Zentmyer had access to the indictment in the case; both the original and superseding indictments charged Poe and Council together with the murder of Wilbert Moore.

As for whether the murder was cold, calculating, and premeditated, *see* 720 ILCS 5/9–1(b)(11), the jury was more than entitled to conclude that it was. To make the finding, the jury must have had sufficient evidence that the defendant(s) were "not motivated by mercy or the emotion of the moment," *People v. Williams*, 737 N.E.2d 230, 250 (Ill. 2000), and that they "deliberated or reflected upon [the murder] for an extended period of time," *id*. A permissible view of the evidence is that the intent to murder Moore existed before the day of the murder; Bush called in Moore's location for a reason. Council and Poe arrived on the scene in response to that call—again, arriving with purpose and plan. Moreover, the murder occurred on January 19, 2006, whereas the search warrant had been executed in May 2004, further suggesting an "extended period" of reflection (during some of which Council was incarcerated). The murder was "cold" because Moore was ambushed and then literally made to run for his life, and there was evidence that he was shot multiple times and at least twice while he was trying to hide or had fallen to the ground. It could be viewed, as the government argued, as an "execution," particularly in light of the fact that there was no evidence that Moore had been killed during a robbery—the shooters took neither his watch nor his wallet. And Alan Pugh testified that afterward, the assailants did not flee; rather, they slowly and deliberately walked back to their car. Therefore, the jury was entitled to conclude that the murder was not motivated by mercy nor the emotion of the moment.

### C.     Count Three (Bush): Murder of Terrance Anderson in Aid of Racketeering and Related Count One Additional Findings (Bush, Council)

Defendant Bush challenges his conviction on Count Three and the related Additional Findings, on multiple fronts. The government alleged that Bush committed the racketeering act of first-degree murder (as defined by Illinois law) in killing Anderson. Bush contends that the government failed to prove: "1) that Defendant Bush had the requisite intent to kill to be guilty

of the first-degree murder of Terrance Anderson, 2) that his actions on September 1, 2007 in discharging a weapon 'caused' the death of Terrance Anderson, a fact necessary to prove him guilty of murder, and 3) that the specific intent and purpose of murdering Terrance Anderson was to enhance his position as a member of the Hobos enterprise." Bush Mot. 3, ECF No. 1190.

Bush does not, therefore, challenge the conclusion that he shot Anderson—just why he did it, whether he intended to, and whether his bullets were a "but-for" cause of Anderson's death. Not challenging the shooting itself is consistent with the evidence that in state court, in the midst of his first-degree murder trial, Bush pled guilty to the second-degree murder of Anderson. After being read the amended charge and confirming that he understood it, Bush stated under oath that he was "guilty" of that charge (although he continues to maintain his innocence). The charge was that Bush "without lawful justification, intentionally and knowingly shot and killed Terrance Anderson while armed with a firearm, and that, at the time of the killing [he] believed the circumstances to be such that that if they existed would justify or exonerate the killing under the principle [of self-defense], that his belief in this was unreasonable, and constitutes a violation of [second degree murder statute]." Bush Guilty Pl. Tr., Gov. Ex. 1809.

This evidence defeats Bush's argument that the government failed to prove that he had intent to kill that is an element of first-degree murder under Illinois law (which provides the substantive law for RICO's enumerated racketeering acts). Although Bush's state-court second-degree murder plea was based on the charge that he shot and killed Anderson with the actual, but unreasonable, belief that he was shooting in self-defense, that qualification only underscores that he intended to kill Anderson. But even aside from the admission, the evidence showed that Bush had been planning to murder Anderson since a dispute arose between them years earlier—a dispute that entailed Anderson shooting Bush in the hand and Bush sending an associate to slap

Anderson's girlfriend and deliver a threat to Anderson. Anderson then went to prison. Chad Todd testified, and the jury was entitled to believe, that Bush told Todd he was "stalking" Anderson's "out date," *i.e.* release date. Trial Tr. Vol. 25 at 5848. This statement demonstrates intent to kill and also goes to the Additional Finding that the murder was "premeditated." Finally, as counsel for Bush pointed out during a jury instructions conference, *see* Trial Tr. Vol. 50 at 11726 *et seq.*, there are three variations of first-degree murder in the Illinois statute. Accordingly, the jury was instructed that a person commits first-degree murder if, in causing a person's death, he: "(a) intends to kill or do great bodily harm to that individual; or (b) he knows that such acts would cause death to that individual; or he knows that such acts create a strong probability of death or great bodily harm to that individual." These states of mind are disjunctive. Yet Bush seeks acquittal because "the requisite intent to kill" was not proved. He fails to account for the other two guilty states of mind that stop short of affirmative intent to kill but are sufficient for conviction of first degree murder.

Bush also argues that there is no evidence that the murder was committed in aid of racketeering. But the circumstantial case for a connection to the racketeering enterprise was substantial. Anderson was infringing on Bush's drug operation at the Ida B. Wells "extensions" (a part of a housing project) and Bush had warned Anderson to vacate the territory. Then, in 2005, Anderson shot Bush in the hand at one point, and later Bush had someone approach Anderson's girlfriend and threaten Anderson while slapping her. Further, there was evidence that on one occasion Bush pointed Anderson out to his Hobos associates (Todd, Ford, and Council), and declined Ford's offer to shoot him on the spot, for fear of surveillance cameras. Thus Bush involved other Hobos, including Ford and Council, in the plot to murder Anderson. The plot came to fruition when Anderson had a weekend pass from his work-release program on the

weekend of September 1, 2007. Anderson was present for a party reuniting former residents of the Robert Taylor homes, which Bush and Council also attended. The timing of the murder might have made it, as Bush says "a crime of opportunity," but the point is that Bush was seeking that opportunity over a period of time. It may be correct, as Bush argues, that there was no *active* dispute over drug territory between Anderson and Bush at the time of the murder, because Anderson had been imprisoned for two years and was out on a weekend pass when he was murdered. But the dispute arose over drug trafficking, which was a key act of racketeering in the Hobos enterprise, and escalated from there. That it took Bush a couple of years to gain closure, because of Anderson's incarceration, does not undermine the jury's reasonable conclusion that he murdered Anderson in aid of racketeering; rather, it serves as evidence of the continuity of the Hobos enterprise and Bush's commitment to accomplishing its objectives.

Bush also raises the argument that the government failed to prove that Bush's shooting caused Anderson's death because (as he correctly notes) the record contains evidence of shots entering Anderson's body through his front and his back and of at least two kinds of bullets, and no evidence of what kind of gun Bush possessed at the time of the shooting.[18] Seemingly, then, at least one other person shot Anderson in addition to Bush.[19] Further, the medical examiner could not identify a single gunshot as "the" cause of death, although he said that at least one—

---

[18] The medical examiner who conducted the autopsy of Anderson, Dr. Michel Humilier, testified to the presence of two kinds of bullets in Anderson's body as well as the location of the entry and exit wounds.

[19] Candidates for the other shooter include Arnold Council and Alonzo "Fat Shorty" Cole. The evidence implicating Council in the murder is recounted further below; *see* pp. 45-46, infra. This Court excluded, over Bush's objections, prior testimony from Cole that he fired a .357 magnum at Anderson and believed that he hit him; that issue is addressed in the context of Bush's new-trial motion.

which entered through the neck and lodged in the brain—was "a fatal shot" in itself.[20]  Further, the testimony of Rodney Jones that both Bush and Council discussed the murder with him did not include any detail attributing the one known fatal shot to Bush. Bush says the government was required to prove that one of Bush's bullets was an independent cause of death, which is to say that, but for Bush's shooting at Anderson, he would not have died from his other wounds.

Bush relies on *Burrage v. United States*, 134 S. Ct. 881 (2014), in which the Supreme Court held that where it could not be determined whether the heroin or the cocaine in the decedent's system caused the death, the heroin dealer could not be held responsible. In *Burrage*, the Court considered whether a mandatory minimum sentence under the Controlled Substance Act where death "results from" the use of the substance "applies when use of a covered drug supplied by the defendant contributes to, but is not a but-for cause of, the victim's death or injury." 134 S. Ct. at 885. The crime the defendant had been found guilty of was heroin distribution. Medical experts determined that the heroin "contributed to an overall effect" that stopped the victim breathing, and that death would have been "very less likely" without the heroin, *id.*, but that was not sufficient. The Court held that the requirement that death "result[] from" the controlled substance required proof not just of proximate causation but also but-for causation. *Id*. at 890-91.

---

[20] There was no evidence of what kind of gun Bush fired, and so no way to connect that gun to a particular wound. Dr. Humilier did not testify that each gunshot wound was fatal, independently, and Anderson had gunshot wounds to his thighs and hand in addition to seemingly more serious shots to his neck/head and back. Dr. Humilier Testimony, Trial Tr. Vol. 17 at 4292. The shot that settled in the occipital load of Anderson's brain was, according to the medical examiner, "a fatal wound." *Id*. at 4307. But no other wound was identified as such, although Humilier testified that Anderson died of "multiple gunshot wounds." *Id*. at 4309. On cross examination, Dr. Humilier testified that there was not "a" cause of death, and "[t]he cause of death is multiple because the wound to the brain is not the only one." *Id*. at 4315.  He also stated that he could not "pin[] down" any of the shots as being the "fatal bullet." *Id.*

Based on *Burrage*, Bush argues that although "the government [is] required to prove that the agent leading to the death of the victim was an independently sufficient 'but for' cause of the death," there was no evidence that "any bullets [Bush] fired in the direction of Terrance Anderson even struck him, let alone led to his death." Bush Mot. 7-8, ECF No. 1190. But once again, Bush simply ignores evidence that undermines his argument. Here there was compelling evidence that Bush shot *and killed* Terrance Anderson—namely, his admission that he did so when he pleaded guilty to second-degree murder. The jury was not required to credit Bush's argument (made at trial[21] and in response to a motion in limine, *see* Bush Resp. 5-6, ECF No. 899), and supported generally by testimony from A.C. Cunningham, the defense expert on the Cook County criminal justice system) that he pled guilty because the State offered him a great deal, not because he was guilty. It was reasonable for the jury to take at face value Bush's prior statement, under oath, that he was in fact guilty of that crime: Bush was present; Bush shot at Anderson intending to kill him because he thought (unreasonably) that Anderson was trying to kill him; and Bush killed Anderson. In pleading guilty to second degree murder, Bush himself provided all of the evidence of "but for" causation that the jury needed—if such evidence was needed at all.

---

[21] "You heard what Gabe Bush was facing, what the charges were, first-degree murder. And if you look at the certified conviction, you will see a whole first page of 20 some charges that he was looking at a mandatory minimum of 45 years up to life. Right? That he denied he was guilty, that he entered a not guilty plea, that he went to trial. He made the government try to prove their case; right? And then the state made an offer while the jury was deliberating. 14 years. So he went from having to serve 100 percent of time, if convicted, which means that he would have gotten 45 years, 20 years minimum for the murder, 25 additional years because of the involvement of the weapon, and he would have had to serve 100 percent of that time. And he could have gotten a lot more at 100 percent. And, instead, they made him an offer for 14 years at 50 percent, which meant he would only have to do seven years. And he could also resolve his UUW case that had been pending for free, basically, because it would run wholly concurrent with the seven years. And they made him that offer, and he accepted it." Trial Tr. Vol. 55 at 13105-06.

Whether the Illinois murder statute requires a showing of but-for causation is a murky point that Bush never addresses. Instead, he relies entirely on *Burrage* for the legal premise that the law generally requires a showing of "but for" causation. In *Burrage*, however, the Supreme Court was interpreting a federal statutory sentencing enhancement; the relevant law here is Illinois law because Count Three required proof of Anderson's murder "in violation of the laws of the State of Illinois." Whereas *Burrage* expressly rejected the premise that proof that an act was a "contributing cause" is sufficient to satisfy the requirements for a sentencing enhancement under 21 U.S.C. § 841 where death "results from" the defendant's conduct, the Illinois Supreme Court has held that under the Illinois murder statute, "the defendant's act need only contribute to the victim's death to prove the defendant guilty of murder." *People v. Brown*, 169 Ill. 2d 132, 153 (1996). *See also, e.g., People v. Martinez*, 348 Ill. App. 3d 521, 529 (1st Dist. 2004) (citing *Brown* in holding that defendants who participated in a group beating that resulted in death caused victim's death even in absence of evidence about "who struck each blow or how many there were"). As *Burrage* acknowledges, there are a number of states that treat "substantial" or "contributing" causes as causes-in-fact, and the Seventh Circuit has said that Illinois is among them.[22] *See Blood v. VH-1 Music First*, 668 F.3d 543, 546 (7th Cir. 2012) ("To establish cause in

---

[22] *Burrage* also acknowledges that Prosser and Keeton advances the proposition that "[w]hen the conduct of two or more actors is so related to an event that their combined conduct, viewed as a whole, is a but-for cause of the event, and application of the but-for rule to them individually would absolve all of them, the conduct of each is a cause in fact of the event." Prosser and Keeton on Torts (5th ed. 1984) at § 41, page 268. *Burrage* dismissed the contention by noting that no one had expressly adopted it as of 1984, but that was not correct. As Justice Sotomayor noted in her dissent in *Paroline*, "[t]he Fifth Circuit recognized this standard more than 60 years ago when it observed that "'[a]ccording to the great weight of authority where the concurrent or successive acts or omissions of two or more persons, although acting independently of each other, are in combination, the direct or proximate cause of a single injury,'" any of them may be held liable "'even though his act alone might not have caused the entire injury, or the same damage might have resulted from the act of the other tort-feasor[s].'" *Paroline v. United States,* 134 S. Ct. 1710, 1737 n.1 (2014) (Sotomayor, J., dissenting) (quoting

fact, the plaintiff must show the defendant's conduct was a material element and a substantial factor in bringing about the injury.") (citing and applying Illinois law). There are, to be sure, Illinois cases pointing the other way, toward a requirement of but-for causation. *See, e.g.*, *People v. Nere*, 2017 IL App (2d) 141143, 2017 WL 2807984, at *18-20 (wrestling at length with the question of whether under Illinois law "an act can be a 'contributing cause' of death without being either a but-for cause or one of two or more independently sufficient concurrent acts" and concluding that the answer is no); *People v. Mars*, 985 N.E.2d 570, 574–75 (Ill. App. Ct. 2013) ("It has long been established that when the State has shown the existence, through the act of the accused, of a sufficient cause of death, the death is presumed to have resulted from such act . . . The injury inflicted by an accused need not be the sole or immediate cause of death in order to constitute the legal cause of death."); *Brackett v. Peters*, 11 F.3d 78, 79 (7th Cir. 1993) (interpreting Illinois law) ("An act is a cause of an event if two conditions are satisfied: the event would not have occurred without the act; the act made the event more likely.").

The government says in a footnote that the evidence showed Bush's shots to be a "contributing cause," but it does not support that as the correct standard, as compared to but-for causation. *See* Govt. Resp. 51 n.22, ECF No. 1207. And although the prosecutor stated in closing argument that "Gabriel Bush walked up to him and put a bullet through his neck and in the back of his head," Trial Tr. Vol. 53 at 123595, the government's response brief provides no citation to evidence demonstrating that the shot to the neck was fired by Bush, nor has the Court found any. But Bush ignores Illinois law entirely, placing all his eggs in *Burrage*'s basket while failing to

---

*Phillips Petroleum Co. v. Hardee*, 189 F.2d 205, 212 (1951) (quoting 38 Am. Jur. Negligence § 257, p. 946 (1941)). And courts have continued to recognize it. *See, e.g.*, *Maiz v. Virani*, 253 F.3d 641, 675–76 (11th Cir. 2001) (applying doctrine of concurrent causation in civil RICO case and citing Prosser & Keeton: "As we have explained in prior civil RICO opinions, a wrongful act is a proximate cause if it is 'a substantial factor in the sequence of responsible causation.'") (internal citations omitted).

engage with the requirements of the Illinois first-degree murder statute and it is far from self-evident that *Burrage* directly applies to this question. Therefore, it is not necessary to resolve this issue; any argument premised on the requirements under the Illinois murder statute is forfeited.[23] It is, in any event, academic, because there was sufficient evidence to support a finding by the jury that Bush shot and killed Anderson, including his own admission and the recounting of the murder later by Bush and Council.

Sticking with the Anderson murder, Bush's helper, Council, challenges the sufficiency of the evidence supporting the Additional Findings that (1) his racketeering activity "includes the commission, or aiding and abetting, of the first degree murder of Terrence Anderson," and (2) that the murder was "cold, calculated, and premeditated." The argument about the first is feeble. The jury had sufficient evidence from which it could reasonably conclude that Council was involved. For example, if the jury chose to credit this portion of Rodney Jones' testimony, Council pulled up to Jones's corner shortly after the murder and informed him that he and Bush had done it and he personally had pushed Anderson down to the ground. Trial Tr. Vol. 33 at 7704-706; Vol. 34 at 7881-82. And it is undisputed that Council was present at the party where Anderson was killed and that within the crime scene was a white hat that contained his DNA. Trial Tr. Vol. 17 at 4257-60. (One witness testified that "Gabe," not Council, was wearing a white hat, but Bush's DNA was not detected. Trial Tr. Vol. 17 at 4386, 4390; Vol. 18 at 4477-78.) All of this corroborated Jones's testimony.

---

[23] It bears noting as well that Bush did not propose a jury instruction relating to causation, despite proposing his own instruction for first-degree murder (Defendants' Proposed Instruction U), and devoted only a few seconds of a closing argument of roughly three hours to the issue: "[W]hen there was mayhem and pandemonium and shots being fired in all directions, Terrance Anderson was hit in the front and in the back. That's what the medical examiner said. Not just in one direction, in multiple directions. Nobody knows what bullets killed him or who exactly shot him. Right? Nobody knows whether one of these two bullets were bullets fired by Gabe Bush. It was chaos. All right?" Trial Tr. Vol. 55-B at 13108-09.

As to the "cold, calculated, and premeditated" finding, this Court has already addressed premeditation. Council knew that Bush was surveilling Anderson for the purpose of killing him (he helped), *see* Trial Tr. Vol. 20 at 4997, and Bush admitted to "stalking" Anderson's release date. Trial Tr. Vol. 21 at 5000, Vol. 25 at 5848. The jury could have also concluded, reasonably, that the murder was "cold and calculated," that is to say, "not motivated by mercy or the emotion of the moment." *Williams*, 737 N.E.2d at 250. The first prong is inapplicable, and the second was sufficiently proved. Bush and Council crept up on Anderson and secreted themselves in bushes in order to ambush him. This is not an "emotional" approach. Further, there was no interaction with Anderson that could support a finding that Bush and Council were provoked into an emotional response. Therefore, the jury was within its rights in making the "cold and calculated" finding. Bush does not make any separate argument about the special findings on the Anderson murder, so any sufficiency-of-the-evidence argument that he incorporated also fails.

### D. Counts Four and Count Five (D. Vaughn): Murders of Bluitt and Neeley in Aid of Racketeering and Related Count One Additional Findings (Vaughn, Bush, Council, Ford)

Counts Four and Five charged Dereck Vaughn with the VICAR murders of Antonio "Beans" Bluitt and Gregory "Slappo" Neeley, the two New Town Black Disciples who were ambushed in a parked Range Rover outside a funeral home they had recently exited. Cashell Williams and Roosevelt Walker were in the backseat of the Range Rover, and survived the shooting, which was carried out by a processional of cars carrying multiple shooters.

In his cursory challenge, which cites neither authority nor evidence, defendant Derrick Vaughn contends that although "the jury could have rationally concluded that the Defendant's statements [to witness Courtney Johnson] were an admission of his presence at the scene when Bluitt and Neeley were shot and killed," what it could not have concluded, "based o[n] any

evidence, was that the Defendant participated in the murder." Vaughn Mot. 2, ECF No. 1185. There was no evidence to confirm his "actual participation," he says, because he stated only that "he did not shoot at the victims, since the weapon he had malfunctioned." *Id.* at 2-3. Moreover, the only corroborating evidence (according to Vaughn), the testimony of Rodney Jones (who testified to his own participation in the murders as well) was too incredible, vague, and contradictory to be considered as evidence. Both of these arguments fail. Again, the credibility of Jones was for the jury to decide, and the Court cannot and does not conclude that he was incredible as a matter of law. Moreover, there is nothing "vague" about the following testimony from Jones: "Q. Who did you see firing out of the car that Joe Buck was driving? A. D-Block. Q. Who was D-Block shooting at? A. He was shooting into the Range Rover." Jones Test., Trial Tr. Vol. 33 at 7568.

To characterize Vaughn's own statements as evidence of "mere presence" and not "participation," moreover, is a substantial stretch. "The mere-presence doctrine means just what it says—presence and nothing more." *United States v. Starks*, 309 F.3d 1017, 1026 (7th Cir. 2002). Vaughn was there (according to Rodney Jones, in the last car in the drive-by procession, as a passenger), with a gun, and he tried to fire at the victims. He had every intention of participating in the sneak attack. He was not a "bystander," *see id.*, in any possible way.

Moreover, Vaughn "did not shoot at the victims," in only the most technical sense, if his statements to Courtney Johnson are credited. He told Johnson once that his gun did not work, *see* Tr. 5613T at 13[24] (gun "don't even fire" when he tried), and then later that he "didn't even get a chance to shoot the one I had [because] [t]hey shot so fast," Vaughn Tr. 5613T at 14. Vaughn seemed either unsure or evasive about his participation in the murders; indeed, it appeared that

---

[24] The transcripts, not in evidence, were used to aid comprehension of the actual recording in evidence, see Gov. Ex. 5613.

he didn't distinguish his own actions from any of the other Hobos soldiers. He told Johnson more than once, with reference to these murders, "*We* did that shit." In any event, it doesn't matter whether he was able to shoot or not; even if he didn't shoot, Vaughn was present, lending support and strength in numbers to the operation. He was another body, another potential shooter, another set of eyes. As such the evidence was sufficient to convict him.

The jury also returned Additional Findings on the funeral home shooting against Council, Ford, Bush, and Vaughn. The first two of these defendants expressly challenge the sufficiency of the evidence regarding these findings (although Council does so only in two conclusory sentences), while the others incorporate the others' (primarily Ford's) arguments. Vaughn, as noted, was convicted on two counts of VICAR murder, and the jury further found as to all four of these defendants that their racketeering activity for purposes of Count One included the murders of Bluitt and Neeley, and that the murders were committed in a cold, calculated, and premeditated manner.

Ample testimony placed all four defendants in the procession of cars from which the drive-by ambush occurred. Rodney Jones participated in the murder and gave detailed testimony about which car each defendant was in and where, and what weapons certain of them possessed at the time. *E.g.*, Trial Tr. Vol. 32 at 7510, 7515-17, 7536 – 7537. Chad Todd reported what he remembered Bush telling him about the murders (albeit with at least one error—placing the incarcerated Poe at the scene). Trial Tr. Vol. 21 at 5180. Jones also testified that Council was the one who found him and other associates and had them get weapons and get in cars because Council "got a location" on Beans. Trial Tr. Vol. 32 at 7514. Bush had already arrived at the rendezvous point when Council and Jones arrived. *Id*. at 7515. Shortly thereafter Gabriel Bush and Arnold Council were "discussing about how [the group] was going to go about trying to get

to the guy as far as to kill him." *Id.* Bush and Council "came up the plan to crash the car into another car." *Id.* at 7518. Ultimately it was Bush who ordered the alternate plan to just line up and "go, go, go," and while he was in front, he was telling the others where to go. *Id.* at 7519, 7523-24. Bush was in the front car to start with. *Id.* at 7523. Jones was in the car with Council and others, and they eventually took the lead ahead of Bush; behind Bush was a third car, and the last car was driven by Ford with Derrick Vaughn as the passenger. *Id.* at 7524-25. Chad Todd testified that Bush called him at college the day of the murders to tell him what happened. Trial Tr. Vol. 21 at 5176-78. Cashell Williams, who survived the shooting, corroborated the general description of the incident, although he had not seen who, other than Ford, was in the cars from which the hail of gunfire rained. Trial Tr. Vol. 28 at 6803-6828; Vol. 29 at 6837-6846. This evidence, if believed, was a sufficient basis on which the jury could conclude that Vaughn, Council, Bush, and Ford all took part in the drive-by murders, and, indeed, that Bush and Council spearheaded the whole event.

Related to the killing of Bluitt, defendant Chester also challenges the sufficiency of the evidence supporting the Additional Finding that the racketeering activity upon which his Count One guilty verdict was based "includes the first degree murder of Antonio Bluitt by one or more co-conspirators whose acts advanced the goals of the conspiracy and were reasonably foreseeable to Chester"—in other words, the finding that Chester was guilty of the Bluitt murder by means of *Pinkerton* liability. *See Pinkerton v. United States*, 328 U.S. 640, 647–48 (1946).[25]

Chester argues that there was no evidence that Bluitt's murder was foreseeable to him. Chester correctly states that there is no evidence that he was on the scene of the murder and no

_____

[25] A separate instruction on *Pinkerton* was given in the Additional Findings instructions but not the general instructions, *see* Jury Instr. "Potential Liability for Other Conspirator's Acts," ECF No. 1087. Chester's challenge to the instruction is addressed in the ruling on his motion for a new trial.

evidence that he discussed it with anyone before it occurred. But he goes too far in suggesting that the jury was required to accept his testimony that, having been shot 19 times months before the murders, he was "incapacitated" or in a coma at the time of the shooting and could not have foreseen or been aware that it was in the works. Chester Mot. at 12, ECF No. 1192. The records of the rehabilitation institution show otherwise, *see* Gov. Ex. 1200_C, and having opted to testify, the jury was entitled to reject Chester's testimony as not credible, partially or wholesale, in any event.

As noted, the attack on Chester, according to multiple sources, is what prompted the Hobos to target Bluitt in the first place, and as a leader in an organization where retaliation was part of the code, Chester would have had reason to foresee that the Hobos would avenge his shooting and reinforce their dominance. As Chester admits, moreover, there was "evidence of rumors on the street that Mr. Chester had put a bounty on Bluitt," and although he says no evidence showed there was really a bounty (and, indeed, that Bush was offended by the notion of paying anyone for an honor killing[26]), the existence of such a rumor tends to support Chester's knowledge of, if not involvement in, the murder. Whether the rumor was true or not, the jury was entitled to conclude that Chester knew about it if it was circulating among the Hobos. The jury, moreover, could reasonably conclude that Bush or Council would not have independently decided to "put a bag" on (*i.e.*, offer a reward) the suspected orchestrater of Chester's shooting.

---

[26] In William Ford's jailhouse recordings with Todd, he recounted that Bush was offended at Chester's suggestion of paying for Beans' murder. After Todd said that Chester said after Bluitt's murder: "I'ma hit y'all for that shit . . . I'ma pay y'all for …don' it," Ford stated: "And the whole time Louie [Bush] be like 'Fuck you  mean pay us? What you mean pay us? Nigga you one of the guys. Nigga we ain't getting' paid for that nigga. That's what we supposed to did . . . for you." Ford Tr. 4806 B at 6. The defendants ignore this evidence in arguing that the Hobos was not an enterprise.

That no bounty ever was paid does not disprove that one might have been offered, or was believed by the younger Hobos to exist.

Next, there was ample evidence that the murders were committed in a cold, calculated, and premeditated way. Premeditation is clear, if the trial testimony is credited. The jury could reasonably conclude that the Hobos had been planning to murder Bluitt to avenge Chester's shooting by, they believed, Bluitt's gang faction, the New Town Black Disciples. Also, there was testimony that the murder of Bluitt was being plotted within days of Chester's shooting and that there was a bounty on Bluitt's head. In the days preceding the funeral home shooting, Chad Todd "went looking for Beans" and was planning to kill him. Trial Tr. Vol. 21 at 5108. He and Gabriel Bush waited outside Bluitt's house one day for that purpose. On the day the murder was actually committed, Council rallied up shooters upon learning Bluitt's location.

The defendants also spent time planning the killing after they met up near the funeral home where they knew Bluitt was present. Plans were discussed. Everyone there knew why they had come. This was not a crime of passion; it was carried out after reflection and deliberation. Ford's argument that the murderers were "a haphazard and hurried collection of people and resources to quickly confront 'Beans' and 'Slappo' out on the street" is wholly inconsistent with the evidence at trial. The shooters gathered from all over in a single location. And it was not a crime of passion, motivated by the emotion of the moment. This was an ambush of unknowing victims who had not provoked the killers beforehand (that day, anyway). Consider just Derrick Vaughn's account of waiting for the ambush to begin:

> So they come out. . . . We back there bored, tweaking. All us back there. Parked right there, hoping police don't come back there. We back there with hoods up and shit. . . . Waiting for a minute. . . . I'm thinking, I'm like this shit finna happen. That's all I was saying, I swear to God. That's all that was in my mind. God damn. It's a hit.

Vaughn Tr. 5603T at 15. The jury had sufficient grounds for finding that the murder was cold, calculated, and premeditated.

### E. Second Superseding Indictment: Obstruction of Justice by Means of Murdering Keith Daniels (Poe) and Related Count One Additional Findings (Chester and Poe)

As to the Charge Formerly Known As Count Six, Paris Poe argues that the government failed to prove that, for the purposes of obstructing ongoing judicial proceedings, he murdered Keith Daniels, the Hobo-turned-informant who did three controlled drug buys from Gregory Chester that led to Chester's arrest in 2013 with Lance "Double" Dillard on drug charges. *See* 18 U.S.C. § 1503(a) & (b)(1). At the time, the federal grand jury investigation into this conspiracy case was ongoing as well. The drug prosecution and the grand jury investigation are the two judicial proceedings referred to in the Second Superseding Indictment. The charge required the government to prove that Poe obstructed or intended to obstruct the named proceedings, and that in killing Daniels he acted knowingly, corruptly, and with the purpose of wrongfully impeding the due administration of justice. *Id.*; *see generally United States v. Aguilar*, 515 U.S. 593, 599 (1995); *Torzala v. United States*, 545 F.3d 517, 522–23 (7th Cir. 2008) (describing the "elements" of a violation of the omnibus clause to include that: "(1) a judicial proceeding was pending; (2) the defendant knew of the proceeding; and (3) the defendant corruptly intended to impede the administration of that proceeding.").

For his protection, Daniels had been relocated from Chicago to Dolton, Illinois, but the precaution was for naught. Daniels was gunned down in front of his fiancée, Shanice Peatry, and their two small children on April 14, 2013, as the family arrived home after visiting Daniels' family. A shooter approached from the area in front of the car and began firing at the windshield. Daniels, who had been in the front passenger seat, got out, and after he was felled by a shot to

the armpit, he was shot again multiple times as he lay on the ground. Neither Peatry, who was in the driver's seat facing the shooter as he approached firing, nor the children were hit by the gunfire. The assailant (or assailants) escaped in a waiting vehicle which was parked close by; the shooter at the front of the car walked right by Peatry, seated in the driver's seat, as he left the scene. A seemingly distraught Peatry called 911 while also trying to tend to Daniels' wounds. She told the 911 dispatcher that there were "two of them" and that "Poleroski" (a.k.a. Paris Poe) shot Daniels. The getaway car, she said, was a "gold Trailblazer." Later that night Peatry picked Poe out of a photo array as the man she "seen shooting," and she identified Poe in court.

The murder occurred days after Gregory Chester had been arrested on April 10, 2013 on the charges relating to the drug deals he had done with Daniels. When Chester was arrested, he learned that Daniels was the informant in his case, not because law enforcement officials gave him a name, but because it was clear from the charges. On the same day, Paris Poe, who had been on electronic monitoring as part of his supervised release in another criminal case, cut off the monitoring device strapped to his ankle and absconded, just a few months before his two-year supervision would have ended.

On April 13, 2013, from jail, Chester phoned an acquaintance who put Poe on the line with him. The three-minute call was recorded. The two spoke at times in what the government characterized and the jury could have accepted as a simple code intended to disguise the discussion. Chester appeared to tip Poe off about a broader investigation in saying things such as "They on sin-ome other shit," [they on some other shit] and "they coming with some other shit and goddamn it, probably real soon . . . . All type of shit." Chester Tr. 4619AT at 1-3.[27] Poe told

---

[27] This transcript corresponds to the recording in evidence as Gov. Ex 4619.

Chester, "it's all good" and that Chester should "play chess,"[28] and then, (phonetically): "But a motherfucker bin-op din-ead.[29] ["But a motherfucker be . . . dead."] When I catch him." *Id*.

The murder occurred the next day. Within an hour of the shooting, Chester spoke to the same acquaintance who previously connected him to Poe (he did not speak to Poe at that time). Of "Dude," with whom the caller had not spoken since the day before, Chester said "He didn't even have to do that." Tr .4619BT at 1. But Chester also "underst[ood] though, too" and stated, "Better be safe than sorry." *Id*. at 2. The caller suggested, "there gotta be a outcome," and Chester laughed and said "it's gone be a outcome." *Id*. Later that night, an unidentified male caller (whom Chester identified in his testimony as Lamar Murphy) told Chester that a guy had "pulled up in his lil' Trailblazer and shit on it." Tr. 4619_DT at 4.

Poe remained at large for weeks after he absconded from supervised release; evidence showed he travelled to Madison, Wisconsin, and then the Wisconsin Dells, then to Las Vegas, and back again to Madison. During this time period, he cut off his distinctive dreadlocks. He made several new acquaintances, who provided him with lodging and meals and some of whom accompanied him to Las Vegas. They knew him as "Chris." Ultimately Poe was arrested on May 3, 2013, as he tried to hastily leave town with a woman he had met in Wisconsin.

In addition to the evidence summarized above, the government presented the testimony of Brian Zentmyer (admissible only against Poe, pursuant to a limiting instruction), who was in

---

[28] The government argued that "play you some chess" was a suggestion to think strategically: "[Poe] wasn't talking about playing chess. He was talking about strategizing about what they had to do to get rid of this threat. You heard in one of the William Ford recordings this reference to chess: Louie played chess. Louie make his move and he watching the board." Trial Tr. Vol. 53 at 123660. Chester argued: "'Keep strategically thinking,' it's dumb. It's not code. And you wouldn't need to say that unless you were trying to paint the target." Trial Tr. Vol. 54 at 12798.

[29] Chester's counsel suggested at trial that the phrase on the recording sounded like "bin-op din-own" ["bop down"]. Trial Tr. Vol. 45 at 10536.

jail on a state-court conviction for marijuana trafficking, and was a cell mate of Poe's for months in the Kane County jail. Zentmyer often served as a jailhouse lawyer for others in custody, and he testified that Poe sought advice from him about his arrest and the charges in this case. Trial Tr. Vol. 43 at 10118 -10259. Zentmyer testified, among other things, that Poe told him he cut off his monitoring band, went to Dolton, and shot "the victim" in his car several times. Zentmyer said Poe told him "this guy had made heroin buys off of Bowlegs" and was "the main guy to testify against Bowlegs."

As he did at trial, in his motion Poe tries to discredit the primary witnesses who pointed the finger at him. He brought out the stormy relationship between Daniels and Peatry, including mutual infidelity, something that prompted Peatry to post on Facebook a year earlier, in April 2012, that Daniels was working as an informant for the government. She later lied about having posted this information that "outed" Daniels. Peatry was also in very frequent contact with her paramour, Arsenio Fitzpatrick, in the ten days leading up to the murder. Peatry deleted these contacts, and all of her text messages and call records, from her mobile phone hours after the murder, to prevent anyone from seeing her "personal business." Peatry had also been inconsistent throughout the investigation about whether Poe was wearing a mask, a beanie, or nothing, on his head and face during the murder, but ultimately she rested on the story that the shooter's face was covered. And at trial she testified for the first time (having previously given statements to police and testified before the grand jury) that she identified Poe as the shooter based primarily on his walk. Poe called an expert who testified about numerous factors that would undermine an identification such as Peatry's, including the obstruction of the suspect's face and the presence of the firearm. Further, Peatry might have been predisposed to identify Poe because she and Daniels had heard that Poe was at large, and they were concerned. Poe also

challenged Peatry's testimony that, insofar as she couldn't view the face of the masked (or beanied) assailant, she identified Poe by his walk. Poe cast doubt that Peatry had carefully observed Poe on prior occasions. She testified that she had seen Poe "at most, four times" in her entire life. Trial Tr. Vol. 42 at 9923.  And Poe also showed that Poe was in jail in the "hot" months of 2009 or 2010, the only (somewhat) specific time she testified that she observed him in the past, walking with Daniels in Washington Park. *See* Trial Tr. Vol. 55 at 12994 ("He goes in May 14th of 2009 when it is not hot outside, and he doesn't get out until December 17th of 2010.").

As to Zentmyer, Poe made a vigorous effort to show that his notes and testimony seemed to be pulled from the indictment or new reports rather than Poe himself. The government responded with evidence and argument that Zentmyer had related details about the Daniels murder that had not been reported. The jury could have credited the witness's own testimony that Paris Poe was his "source of information," Trial Tr. Vol. 43 at 10237, and that he never saw a criminal complaint against Poe for the murder of Keith Daniels, *id.* at 10241. The government also showed, through this Court's judicial notice, that the location of the murder (Dolton, Illinois), and the fact that Daniels was Council's younger brother did not appear in the complaint, but Zentmyer knew those facts. *Id.* at 10244. The same was true with respect to the presence of Daniels' girlfriend (who had been referred to only as "Witness 1") and their children.

 Poe also emphasized that Zentmyer was an admitted liar who testified that as a pseudo-attorney, his motto was that clients should tell him the truth and let him do the lying for them. Both Peatry and Zentmyer were, deservedly, "caution and great care" witnesses whose testimony the jury was instructed to weigh carefully. But that does not mean that the jurors could not have reasonably believed some or all of their testimony.

Poe also presented the jury with some alternative theories of the murder. One was that any number of people knew for about a year, from Peatry's Facebook post, that Daniels was an informant, and therefore many people might have had the motive to kill him. But this is not inconsistent with the jury's conclusion that Poe killed Daniels for being an informant; it simply shows that others who learned about Daniels in another way had a similar motive to wish harm on Daniels. Another theory was that there were multiple shooters. And there may well have been, but only Poe was on trial, and if the jury thought that more than one person murdered Daniels, [30] that does not show that Poe wasn't one of them. Poe also floated the idea that Peatry might be covering for Arsenio, whom she called "her man." [31]

Poe's most specific alternate theory of the crime is that it was committed by two men named Lamar Murphy and Ricky Royal. Daniels had committed crimes with them in the past—specifically, a home invasion/robbery/kidnapping. Moreover, according to Peatry, at one time she was present when Royal and Murphy asked Daniels to run their drug line on the west side of Chicago. Poe contends that this evidence points to Murphy and Royal as the killers because they, unlike Poe, had a criminal history with Daniels, and, unlike Poe, they had a "close relationship" with Daniels. Moreover, on the day of the murder, Daniels received a text message warning him that two people (described with a racial slur) from "out west" were out to kill him. Peatry confirmed that Murphy and Royal were west-siders (consistent with the location of their drug line). Poe further argues that the evidence of two shooters—the presence of two different caliber

---

[30] Peatry testified that there were two people there, but identified only one shooter. A neighbor testified that on April 10, 2013, the day of Chester's arrest, she had observed a "tan SUV" (consistent, at least somewhat, with a gold Trailblazer), casing Daniels' home. This person could not have been Poe, whose monitoring records show that he was at home at that time on April 10.

[31] In view of Peatry's testimony that the shooter fired at the windshield, while she was sitting in the driver's seat, and at the car while her children were in the back seat, it seems particularly far-fetched to argue that the shooter was Peatry's lover.

shell casings at the scene, each in their own, different, area, and the differing descriptions of the killer by Peatry and her son—supports the Murphy-and-Royal hypothesis. Finally, there was evidence that the unidentified male to whom Chester spoke from jail after the murder was Lamar Murphy, a.k.a. "Lil' Cuz." Chester, who testified at the trial, stated that he had been speaking with Murphy, not Poe, after the murder (a fact that, if Poe's theory were credited, hardly exculpates Chester).

Because (according to Poe) there were no credible witnesses against him and a more plausible theory of the murder, he argues that as a matter of law he must be acquitted for lack of sufficient evidence. The problem is that Poe presented all of this to the jury during cross examinations, his defense case, and closing arguments.[32] His motion simply highlights that the jury was not persuaded. The jury could have rejected the government's witnesses, or believed Poe's theory, but apparently it did not. "Alternative explanations are generally not enough to win a challenge to the sufficiency of the evidence." *United States v. Presbitero*, 569 F.3d 691, 700 (7th Cir. 2009). Taking the evidence in the light most favorable to the government, the jurors' conviction of Poe on Count Six was reasonable. The timing of Poe's disappearance (right after Chester's arrest); his discussion with Chester about the arrest and possible further charges; his identification as the shooter by an eyewitness (Peatry); his flight for weeks thereafter for no good reason; and his history of protecting Chester and silencing cooperators like Wilbert Moore through murder add up to sufficient evidence for a reasonable jury to conclude beyond a reasonable doubt that he killed Daniels. The jury's verdict cannot be overturned for insufficient evidence just because there was a reasonable alternate theory.

---

[32] The Court even permitted Poe's counsel to demonstrate that there was nothing distinctive about his walk that would have permitted Peatry to identify him.

Next, Poe argues that there was insufficient evidence of his intent to obstruct the drug cases against Chester and Dillard, and the grand jury investigation into the racketeering conspiracy in this case. Here, Poe is splitting hairs about what the jury reasonably could have inferred from the evidence. It is true, as Poe says, that there is no evidence that he knew about the grand jury investigation *per se*, but, as Poe concedes, there is evidence (from his conversation with Chester) that he knew "charges were coming." Poe Mot. 21, ECF No. 1188.  It is not unreasonable as a matter of law for the jury to have inferred that Poe, who had ample exposure to the criminal justice process, knew that charges "were coming" from a grand jury. Poe also says that the government failed to supply evidence that he knew about Chester's drug case, as he only heard from Chester about his arrest, not the nature of the charges. Poe's failure to ask Chester about the charges suggests he was well aware, from whatever source, that Chester and Dillard were being held on federal drug charges.

Chester also challenges the Additional Finding that the Keith Daniels murder was foreseeable to him and in furtherance of the conspiracy. This challenge is specious because there was ample evidence to support the finding. Poe, who was on electronic monitoring that was soon to expire, went AWOL right after Chester was arrested for the drug sales to Keith Daniels. Chester knew immediately that Daniels was the confidential source, as he stated to the police when informed of the evidence against him. Chester spoke to Poe and they cryptically discussed a game plan; hours later, Daniels was dead, Poe was on the run, and Chester was informed about the murder in a call to the jail. On the calls, Chester, for good reason, did not say in clear and grammatical language that Poe should kill Daniels or that Poe had done so, but the jury could have reasonably believed, especially given the timing and context, that Chester's conversations from jail were admissions of exactly that. Moreover, Arnold Council told his (and Daniels')

mother that Daniels, in essence, got what he had coming; it was no secret, therefore, among the

Hobos that Daniels was murdered for ratting out Chester and others. Chester does not address

any of this evidence; instead he resorts once again to the frivolous refrain that there was "no

reliable evidence" that he had "any involvement whatsoever." Chester Mot. 12, ECF No. 1192.

Absent a more specific argument, Chester fails to show that the extraordinary step of vacating a

jury finding should be taken. And, again, it bears noting that the jury was free to reject Chester's

account of his phone calls and, in so doing, to treat his false denials as substantive evidence of

his complicity in Daniels' murder. *Jocic*, 207 F.3d at 893.

### F. Count Seven (Council): Aiding and Abetting The Use, Carrying, or Brandishing of a Firearm During and in Relation to a Robbery Affecting Interstate Commerce and Related Additional Finding of "Brandishing."

Arnold Council challenges the sufficiency of the evidence to convict him on Count

Seven, which pertains to the armed robbery of the Collections clothing store on November 8,

2008. The robbery was captured on videotape, see Gov. Ex. 4002_A-4002_D. It depicts the

robbers entering the store, with Arnold Council last. Council goes straight to the back wall and

begins stripping it of Pelle Pelle (an expensive luxury brand) jackets, while the others round up

the store employees and force them into a back room. When the jackets were stuffed into bags,

the robbers grabbed them and left the store. At least two robbers, Kenneth Bland and Ahmad

Hicks, carried guns during the robbery (the fourth robber was Hobo Pierre Skipper).

Council does not deny his participation in the robbery (he pled guilty to the offense in

state court).[33] But he argues there was no evidence he knew about the guns before the robbery or

that he became aware of them during the robbery because Bland and Hicks kept them up their

---

[33] Specifically Council pled guilty to "straight robbery": that on November 8, 2008, he "took property, to wit clothing, from the person or presence of Eleanor Johnson by the use of force or threatening the imminent use of force." Trial Tr. Vol. 36 at 8664.

sleeves. But there was a sufficient basis in the evidence for the jury to have reasonably drawn either conclusion.

That Council knew about the guns before the robbery is supported by the videotape. At several points, albeit fleetingly, guns are visible. Further, there was a clear and organized procedure being deployed from the moment the robbers entered: secure the employees, round them up and keep them from fleeing, grab the jackets, and go. No physical force was used to compel the employees; they were physically guided but not beaten, which is consistent with testimony that guns were used to gain their swift compliance. With such an orderly process, the jury could reasonably infer from the videotape that using guns was part of the plan from the start. By the same token, the video allows the conclusion that whatever Council knew before the robbery, he must have realized what was happening almost immediately. The employees were marched right past him and held in a back room very close to where Council was grabbing jackets with Skipper. Common sense would permit the jury's inference that Council, no babe in the woods, was aware of what was happening—and even that he deliberately ensured that the firearms were wielded only by his junior colleagues.

The testimony of Kenneth Bland directly supported the prior-knowledge theory of the crime. Council argues that none of Bland's testimony can be credited. Indeed, Bland's trial testimony was at time internally contradictory, and was inconsistent in several ways with his prior statements about the robbery and, particularly, the guns. But, once again, the testimony was not incredible as a matter of law, and the jury could have believed Bland. Bland was consistent that Council proposed the robbery when he approached the car parked near Collections where Bland, Hicks, and Skipper were sitting. Trial Tr. Vol. 36 at 8528-29. When he was apprehended, Bland disclaimed knowledge of any guns and then attributed them to Pierre

Skipper (Bland also told some ridiculous lies about working with the FBI). He ultimately said that all three of them had guns, and Council either saw them in their laps or asked them if they had guns. *Id*. at 8529-30, 8589. Bland understood that Council was proposing a "stick up." *Id*. at 8531. Council explained the plan to Bland and the others: "We going in there for the Pelles. He told me where we going to take them at, where we going to take the people at, how many people was in there and where the camera was at off the alley. He told me there was a camera off the alley." *Id*. at 8531-32. When everyone agreed to the plan, Council went off to buy masks and laundry bags. *Id*. at 8532. He distributed these to the rest of the crew before they entered the store. Bland put his gun into his sleeve before he went into the store, and he was the first one in. *Id*. at 8538. During the robbery, Hicks ("Pig") "upped" his gun—pulled it out where it could be seen "all the way."

Physical evidence bore out Bland's testimony as a general matter. For example, he testified that after telling the others that they were going to steal Pelle Pelle jackets from the store, Council went and purchased zip ties, masks, and laundry bags. Evidence recovered after the robbery provided further corroboration; the police recovered the jacket Council wore during the robbery (visible in the video), the guns, the stolen jackets, and zip ties and masks. The video corroborated Bland's account of the robbers' plans to first secure the people in the store and then proceed to collect the jackets. Moreover, the jury could have found it inherently unlikely that as the mastermind, Council was unaware that this was to be an armed robbery.

At a minimum, the jury could reasonably have inferred from the video and the testimony of the Collections employees that Council gained knowledge of the guns during the robbery when his fellow robbers were able to so efficiently escort the employees straight to the back room with little struggle. The employees' testimony supports this view. The manager, Thaer

Atieh, was in the store with two workers, Eleanor "Veronica" Johnson and Tony. Trial Tr. Vol. 35 at 8333; Vol. 36 at 8430. When the robbers entered, "each one of them grabbed one of us [and] took us all the way to the back room…[a] small room for storage." Vol. 35 at 8337. Atieh said he felt something hard pressed against his side that "could be a gun." *Id*. at 8338-39. He saw the tip of a gun either in the back room or outside it. The two men were bound with zip-ties and Johnson with a belt. Johnson testified similarly. When the robbers entered, she was on a ladder at the side of the store. Trial Tr. Vol. 36 at 8432. She said the robbers " grabbed us all and told us to go to the back with some guns in their hand." *Id*. at 8433. She later said she didn't see the gun until she was in the storage room. *Id*. at 8441. The man who guarded the employees in the back storage room "had a gun in his hand, but he wasn't pointing it at [them]." *Id*. at 8437.

Based on the video and the testimony, the jurors could reasonably have concluded that Council became aware that just steps away from the back wall from which Council was stripping jackets, the store employees were being held at gunpoint Moreover, Counsel himself admitted in state court that he obtained the clothing "by the use of force or threatening the imminent use of force," which adds weight to the inference that he knew (during, if not before) that guns were used to rob the store. In the unlikely event that he did not plan for the crime to be facilitated with firearms, the jurors certainly could have concluded that Council became aware of the guns during the robbery,

Council makes no separate challenge the jury's Additional Finding on Count Seven that in the course of the robbery he aided and abetted the "brandishing" of a firearm (as opposed to the use or carrying of one). The jury's finding therefore stands.

### G.    Count Eight and Count Nine (Ford): Unlawful Possession of a Firearm and Possession of Marijuana with Intent to Distribute

Ford does not challenge his conviction on Count Eight, the illegal possession of a firearm by a felon. He does contend that, regarding Count Nine, there was insufficient evidence to prove beyond a reasonable doubt that on February 2, 2013, he possessed marijuana with the intent to distribute it. Ford Mot. 4, ECF No. 1184.  Ford concedes that the government showed that "Ford had some cannabis on a shelf in a bedroom." *Id*. (During a parole search, police found a pink bag containing marijuana in a closet in Ford's bedroom, with a gun nearby.) That takes care of "possession."

Ford argues that "intent to distribute" was not proved because there was no evidence that "Ford was actively selling cannabis at the time of his arrest"; that he was seen "selling drugs on the street"; that there were "undercover purchases of cannabis from Ford"; or that there were any "communications attributable to Ford discussing cannabis sales." *Id*. at 5. But none of these things was an element of the offense that had to be proved beyond a reasonable doubt.

The intent to distribute was proved primarily by way of how the marijuana was packaged. The pink bag contained 50 miniature zip-top bags of marijuana, grouped into five larger bags of ten, which were, in turn, grouped into one large zip-top bag. The total weight of the marijuana was 10.6 grams. An FBI agent confirmed the obvious: that drugs in this format are packaged for distribution. Trial Tr. Vol. 6 at1410-1411. *See Carter v. Douma,* 796 F.3d 726, 738 (7th Cir. 2015) (packaging and quantities evidence of intent to distribute); *United States v. Baker*, 655 F.3d 677, 684 (7th Cir. 2011) (expert witness testifying to distribution-sized amount). Finally, before this search, Ford had previewed his drug trafficking activities himself, when he was recorded in prison telling Chad Todd that he was going get a pound of "kush" (high quality

marijuana) to sell, and that he did not "smoke weed" himself. Tr. 4860_G at 3.[34] The jury had ample grounds for a reasonable conclusion that Ford intended to sell the marijuana that was found in his bedroom.

## II.    New Trial Motions

This Court may grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). A defendant is entitled to a new trial if there is a reasonable possibility that a trial error had a prejudicial effect upon the jury's verdict. *United States v. Van Eyl*, 468 F.3d 428, 436 (7th Cir. 2006). A jury verdict in a criminal case is "not to be overturned lightly," and therefore a new trial should be granted only where there is serious danger that a miscarriage of justice occurred. *See United States v. Morales*, 902 F.2d 604, 606 (7th Cir. 1990). In other words, a new trial is warranted only in "extreme cases." *Id*.; *see United States v. Linwood*, 142 F.3d 418, 422 (7th Cir. 1998).

### A.    Errors Raised by Multiple Defendants

Common arguments are grouped and addressed together in this section. The Court recognizes that all arguments are "common" to the extent that all defendants have adopted all of their co-defendants' relevant arguments and their own prior motions and objections, but this section addresses the issues that were substantively briefed by more than one defendant. Later sections address issues raised by one defendant about his own case.

#### 1.    Co-Conspirator Statements

Multiple defendants state that this Court erred by admitting co-conspirator statements under Rule 801(d)(2)(E) as statements made by a co-conspirator "during and in furtherance of the conspiracy" or, failing those criteria, as statements against penal interest under Rule

---

[34] This transcript corresponds to the recording in evidence as Gov. Ex. 4860_G.

804(b)(3). Chester says, without elaboration, that it was error to allow such statements in as statements-against-interest because they incriminated him and other defendants, not just the declarant. Chester Mot. 6, ECF No. 1192. Bush says many of the statements admitted as non-hearsay co-conspirator statements were "not in furtherance of any conspiratorial objective, were made after the conspiracy had ended, and were idle chit chat and narratives." Bush Mot. 6, ECF No. 1191. But Chester and Bush fail to identify any specific statements that should not have been introduced, much less why. The Court cannot, then, discern whether there was any particular error or whether, if there was, any erroneously admitted statements might have seriously prejudiced the jury's evaluation of the case. Such undeveloped, broad-brush arguments do not warrant relief.

For the sake of leaving a trail of breadcrumbs for the Court of Appeals in the event of any appeal, the Court notes that it partially rejected the government's *Santiago* proffer on the ground that it merely identified ***kinds*** of statements it sought to admit as co-conspirator statements, rather than specific statements. *See* Order, ECF 755; Order, ECF No. 782; Pretrial Tr. 76, ECF No. 1199 (Aug. 30, 2016). Noting that "in almost no case does the *Santiago* proffer actually say, 'here are . . . statements that we believe are admissible as co-conspirator statements and why,'" the Court found the proffer "wanting."[35] To avoid wasting time ruling on statements on an objection-by-objection basis in front of the jury, the Court imposed a process for ruling on admissibility in advance (subject to further objections in real time), which required the government to identify with precision every single statement that it sought to introduce as a co-conspirator statement pursuant to Rule 801(d)(2)(E):

---

[35] The Court did find that the *Santiago* proffer adequately established the existence of the conspiracy and the identities of many (though not all) of the co-conspirators. As reflected in the discussion of the defendants' challenges to the sufficiency of the evidence, *see* pp. 10-23 *supra,* the evidence at trial proved sufficient to confirm the preliminary rulings in that regard.

I'm going to require the government by . . . the end of Sunday of each week of trial, to specifically identify statements the government intends to offer as co-conspirator statements a week later. So if we define a Sunday before a trial week as day one, the government's required to identify for both the Court and the defendants the statements that it expects to offer as co-conspirator statements the week beginning day 8, a week later, the method to that madness being that will give the defendants . . . time to review those proffered statements and identify any objections that they have which I will require to be submitted by the end of the day on Thursday to the Court so that I may address them on Friday before the beginning of the week where we anticipate that they're going to be introduced. *** I need those statements identified as to statements that the government believes are admissible under 801(d)(2)(E) so that I can make the appropriate determination as to whether . . . there's a basis to conclude whether they are, in fact, in furtherance of the conspiracy and that they are being made by a member of that conspiracy.

*Id*. 78-79. No one objected to this process, and therefore, throughout the four-month trial, there were regular sessions outside the jury's presence in which the Court went through a statement-by-statement analysis of the admissibility of the government's proffered statements—indeed, not just under Rule 801(d)(2)(E), but on any other basis by which the government sought to introduce the statements. Throughout the process, which occupied scores of hours of the Court's time during the trial,[36] the Court excluded substantial portions of potential testimony, written statements, and tape-recorded conversations which the Court found were not made in furtherance of the conspiracy or were inadmissible for other reasons.

In light of this process, any defendant seeking to challenge a particular statement or statements in a new-trial motion had a way to identify the statement and address why the Court's stated reasoning was erroneous. The defendants' having failed to do so, except where noted in the remainder of this opinion, this Court will not rule on whether or not, as a general matter, co-conspirator statements should have been admitted generally.

---

[36] *See, e.g.*, Trial Tr. Vol. 18 at 4420 ("Since last Friday, so over the past week, I have spent approximately 26 hours reviewing these transcripts."); Trial Tr. Vol. 16 at 4094; Trial Tr. Vol. 45 at 10434.

Defendant Bush's related argument is that the Court improperly admitted co-conspirator statements that addressed matters outside the scope of the conspiracy, either in time (Bush says any conspiracy ended by 2008) or substance, *i.e.*, not in furtherance of the conspiracy. *See* Bush Mot. 6 (Issue "5E"), ECF No. 1191. Bush makes one unelaborated mention of the recorded statements of defendant William Ford, but does not point to any particular inadmissible statement about an offense that purportedly "had no relation to the charged conspiracy." In any case, the Court has consistently ruled against Bush with respect to the acts within the temporal and substantive scope of the conspiracy and, as explained elsewhere in this opinion (as relevant to the statute-of-limitations arguments and the admissibility of evidence of "unrelated" crimes), it sees no factual or legal basis for changing course now.

### 2.    The Admission of Keith Daniels' Prior Testimony

The murder of Keith Daniels was charged as an act in furtherance of the conspiracy under Count One and against Paris Poe in the Second Superseding Indictment; it was also the subject of Additional Findings against Chester (as part of his Count One acts) and Poe. As set forth in more detail above, Daniels, the younger brother of Arnold Council and a Hobo associate, had been cooperating with law enforcement against Chester, Lance Dillard, and the Hobos as a whole. As part of that cooperation, Daniels gave testimony under oath to the grand jury, and the government expected him to be a witness (likely a star witness) at trial. But he was murdered before that could happen. The government moved *in limine* to admit Daniels' grand jury testimony under the doctrine of forfeiture-by-wrongdoing, Fed. R. Evid. 804(b)(6), and the Court granted the motion provisionally, subject to prove-up during trial. *See* Mot., ECF No. 590-3; Mot. ECF No. 585; Suppl., ECF No. 1028; Orders, ECF Nos. 783 and 1040; Trial Tr. 45 at 10432 *et seq*. Before the evidence was admitted, the Court solicited the defendants' further

objections to Daniels' statements, subjected those statements to the same line-by-line review process used to address the admissibility of co-conspirator statements, granted many of the defense objections, and excised substantial portions of the Daniels' grand jury statement. The Court also revisited its provisional ruling and admitted the redacted grand jury statement pursuant to Rule 806. *See* Order, ECF No. 1040; Trial Tr. 45 10432. At the relevant time, the Court allowed the evidence to be admitted.

Defendants including Chester and Bush now challenge the Court's decision to allow the testimony into evidence in redacted form. That discussion took place in great detail after the Court's initial decision. *See* Trial Tr. Vol. 45 at 10432-10447. Chester contends that even if the Court found that Poe murdered Daniels, Daniels' "statements were only admissible against Mr. Chester if the government could establish that Mr. Daniels was murdered at Mr. Chester's request for the purpose of preventing him from testifying against him," and further, that the forfeiture doctrine "does not allow for the admission of testimonial evidence of the offense that rendered the witness unavailable." Chester Mot. 7, ECF No. 1192. Bush contends that this Court "misuse[d] . . . the *Pinkerton* theory of liability for acts that are reasonably foreseeable to co-conspirators in order to nullify the requirement of knowledge and acquiescence." Further, Bush argues that the Court went afoul of *Giles v. California*, 554 U.S. 353 (2008), because "the exception only applies when the intent for committing the murder is related directly to the purpose of making the potential witness available at a trial." Bush Mot. 8, ECF No. 1191. Finally, Bush argues that it was error to conclude that the Daniels murder fell within the scope of the conspiracy in that the conspirators knew of, engaged in, or acquiesced in the killing. *See United States v. Scott*, 284 F.3d 758 (7th Cir. 2002). Therefore, he claims that he and the other defendants not directly involved were denied their right of confrontation.

This issue has been well litigated already, and for the most part these arguments are not new, so the Court addresses it only briefly. *Giles* holds that "unconfronted" testimony shall not be admitted without a showing that the defendant intended to prevent a witness from testifying, even if the defendant killed the person who made the prior statements. 554 U.S. at 361; *see id*. at 359 ("The terms used to define the scope of the forfeiture rule suggest that the exception applied only when the defendant engaged in conduct designed to prevent the witness from testifying."). On the facts of this case, *Giles* is of no help to those who participated in Daniels' murder. The jury found beyond a reasonable doubt that Daniels was killed in order to obstruct these and other judicial proceedings. The intent to procure Daniels' unavailability, as required by *Giles* and *Scott*, was proved.[37]

Nor does *Giles* help the co-conspirator defendants who were not directly implicated in the Daniels murder, a group that includes Bush. He contends that those defendants' "acquiescence" to the killing was not proved. *See Scott*, 284 F.3d 758 at 762. But it was. For purposes of Count One, the jury concluded that each defendant agreed to participate in a pattern of racketeering activity including intimidating and murdering witnesses, which was one of the purposes of the enterprise (SI ¶ 4(d)) and one of the "means and methods" (*id*. ¶8(b), (l), (m)), as expressly set forth with respect to the Daniels murder in Notice of Special Findings #2, which the jury later concluded was proven. As participants in the enterprise, the defendants are

---

[37] Bush's reliance on *Jensen v. Clements*, 800 F.3d 892, 894 (7th Cir. 2015), is also misplaced. *Jensen* had nothing to do with obstruction of justice or witness murder. It was, for lack of a better word, a "routine" murder case against a husband for killing his wife, where she had earlier written a letter that pointed the finger at her husband if anything were to happen to her. That kind of testimony from the grave violated the Confrontation Clause as interpreted by *Giles*. That case's narrowing of exceptions to the Confrontation Clause did not impact the scenario in this case at all: the forfeiture by wrongdoing rule was limited to circumstances where the witness's unavailability was procured by wrongdoing with the intent to cause the unavailability. That is exactly what the evidence in this case shows the defendants did (or acquiesced in doing) to Daniels.

responsible for every criminal act in furtherance of the conspiracy to the extent it is foreseeable. The Daniels murder satisfies both prongs: the government had sufficient evidence that it furthered the conspiracy because it was designed to cover it up and protect the members, and that it was foreseeable because the defendants knowingly agreed to join a conspiracy in which the killing and intimidation of cooperators and witnesses against the gang was within the conspiracy's scope. Bush certainly understood as much, given his participation in the murder of Wilbert Moore, another cooperator silenced by the Hobos.

Rule 804(b)(6) speaks to "acquiescence" in the wrongful act intended to cause the declarant's availability. That rule is not limited to criminal conspiracies. In the context of one, however, it would be strange indeed to conclude that the knowing agreement to participate in a conspiracy involving murder of witnesses and cooperators does not more than satisfy the general requirement of "acquiescence." That is at the heart of the holding of *United States v. Thompson*, 286 F.3d 950, 964 (7th Cir. 2002), which stated: "by using the term 'acquiesce,' the drafters of Rule 804(b)(6) expressed an intent to allow for the imputation of waiver." Through *Pinkerton*, imputation of foreseeable wrongdoing is the rule in a criminal conspiracy. *See id.* at 964. Therefore, it is no leap to hold that a defendant who knowingly participates in a conspiracy involving a foreseeable act of witness murder to conceal and protect the conspiracy is one who "acquiesces" for purposes of Rule 804(b)(6). The government met its burden with respect to the forfeiture-by-wrongdoing doctrine under the rule and the three-part test of *Scott*, and it was proper to admit Daniels' redacted grand jury testimony against all the defendants.

### 3.  Additional Findings on Offenses Not Charged

Defendants including Chester[38] and Ford[39] contend that it was error for this Court to submit Additional Findings to the jury about defendants unless the underlying criminal act was charged against that defendant in a separate Count or associated with the defendant, by name, in Count One's description of the representative acts of racketeering or in the Notice of Special Findings. They contend that this process violated the Presentment Clause, constructively amended and broadened the indictment, failed to provide them with adequate notice, and violated the rule of *Apprendi*.

---

[38] The jury returned Additional Findings against Chester on Count One regarding the murder of Antonio Bluitt, first finding that "the racketeering activity upon which defendant Gregory Chester's violation is based includes the first degree murder of Antonio Bluitt by one or more coconspirators whose acts (1) advanced the goals of the conspiracy; and (2) were reasonably foreseeable to defendant Chester," and second, that the murder was "committed in a cold, calculated, and premeditated manner pursuant to a preconceived plan, scheme, and design to take a human life by unlawful means, creating a reasonable expectation that the death of a human being would result."

The jury also returned Additional Findings against Chester regarding the murder of Keith Daniels, beginning with the finding that "the racketeering activity upon which defendant Gregory Chester's violation is based includes the first degree murder of Keith Daniels by one or more coconspirators whose acts (1) advanced the goals of the conspiracy; and (2) were reasonably foreseeable to defendant Chester." The jury further found that: (1) it was committed in a cold, calculated, and premeditated manner pursuant to a preconceived plan, scheme, and design to take a human life by unlawful means, creating a reasonable expectation that the death of a human being would result therefrom; (2) it was committed with intent to prevent Daniels from testifying or participating in any criminal investigation or prosecution or giving material assistance to the State of Illinois in any investigation or prosecution, either against the defendant you are considering [a.k.a., Chester] or another person; and (3) it was committed because Daniels was a witness in any prosecution or gave material assistance to the State of Illinois in any investigation or prosecution, either against the defendant you are considering [a.k.a., Chester] or another person."

[39] The jury returned Additional Findings against Ford on Count One regarding the murders of Antonio Bluitt and Gregory Neeley, first finding that "the racketeering activity upon which defendant William Ford's violation is based includes the commission, or aiding and abetting of the first-degree murder" of each victim, and second, that each murder was "committed in a cold, calculated, and premeditated manner pursuant to a preconceived plan, scheme, and design to take a human life by unlawful means, creating a reasonably expectation that the death of a human being would result."

All of these arguments are based on the premise that Chester and Ford were not charged with committing the predicate acts of murder that make them eligible for a life sentence as the result of their conviction on Count One. The premise is correct, but irrelevant. It is true that neither Chester nor Ford were charged with personally participating in the Bluitt and Neely murders, but their eligibility for life sentences does not turn on whether they did so. Count One of the indictment charged them not with murder but with agreeing to conduct the affairs of an enterprise through a pattern of racketeering activity. The defendants' convictions on that count did not depend on proof that they committed the Bluitt and Neely murders personally (which of course is why we are talking about "Additional Findings," that is, findings beyond those that were necessary to convict the defendants on Count One). Indeed, their convictions on Count One did not require proof that the defendants even agreed to commit those specific murders, or any murders at all for that matter. *United States v. Tello*, 687 F.3d 785, 792 (7th Cir. 2012) ("A section 1962(d) conspiracy charge thus does not require proof that the defendant committed two predicate acts of racketeering, that he agreed to commit two predicate acts, or, for that matter, that any such acts were ultimately committed by anyone.") (internal citations omitted).

None of the "Additional Findings" by the jury about the murders of Bluitt and Neely, then, were necessary to support the convictions on Count One, and the facts that were the subject of those findings were not "elements" of that offense. Rather, the Additional Findings about those murders were submitted to the jury because, if proved, they established the defendants' eligibility for a life sentence rather than the 20 year maximum sentence that would otherwise have applied because they showed that the conspiracy was "based on" racketeering activity punishable by life imprisonment. Section 1963(a) of Title 18 sets forth the penalty provisions for violations of the RICO statute, including § 1962(d) (RICO conspiracy, the charge for which the

defendants were convicted in Count One). Section 1963(a) provides that, "***if the violation is based on a racketeering activity*** for which the maximum penalty includes life imprisonment," a sentence of up to life imprisonment may be imposed. Thus, evidence that the defendants' violation of § 1962(d) was based on racketeering activity punishable by life in prison increases the maximum sentence that can be imposed on the Count One conviction to life imprisonment.

This brings us to the principal flaw in the defendants' various arguments about the Additional Findings: the "violation" for which they were convicted was RICO conspiracy, so there was no requirement to charge that they personally committed racketeering acts of murder; their violation of § 1962 was, again, to conspire to conduct the affairs of an enterprise through a pattern of racketeering activity. That conspiracy was "based on" racketeering activity subject to life imprisonment where the predicate acts committed in furtherance of that conspiracy included acts, like murder, that were subject to life imprisonment themselves. And, based on the requirements of *Jones v. United States*, 526 U.S. 227, 243 n.6 (1999) and *Apprendi v. New Jersey*, 530 U.S. 466, 476 (2000), to increase the maximum penalty for that violation, the government was required to charge, and prove, that the defendants' conspiracy to violate RICO included the commission of such acts.

But that does not mean that it required proof that the defendants ***personally*** committed, or participated in, murders—to be guilty of a violation of § 1962(d), the RICO conspiracy statute, one need not personally commit any predicate act. Personal involvement in murder will suffice, of course, but it suffices as well to show that the murder was committed by a co-conspirator in furtherance of the conspiracy and was foreseeable to the defendant. In other words, that the requirements for vicarious liability under *Pinkerton v. United States*, 328 U.S. 640, 647-48 (1946) apply. That is precisely what the Seventh Circuit held in *United States v. Benabe*:

> [O]nce the jury found the defendants guilty of the RICO conspiracy, the maximum penalties they each faced depended on whether the involvement of each in the conspiracy included responsibility for murders or drug crimes serious enough to authorize a life sentence. Each defendant could be held responsible for the various predicate acts charged, either as a direct participant, as an aider-and-abetter, or under *Pinkerton*.

654 F.3d at 777-78.

And as there was no requirement to prove that a particular defendant personally participated in any of the charged racketeering murders, there could not of course been any requirement to **charge** any defendant with personally participating in any of the murders. Further, there was no requirement that the indictment charge that the defendants were vicariously responsible for racketeering murders based on *Pinkerton* liability. *United States v. Sax*, 39 F.3d 1380, 1389-90 (7th Cir. 1994); *see also, e.g., United States v. Powell,* 652 F.3d 702, 708 (7th Cir. 2011) (no requirement to charge aiding and abetting liability in indictment); *United States v. Galiffa*, 734 F.2d 306, 312, 314 (7th Cir. 1984) (neither *Pinkerton* nor aiding and abetting need be charged in an indictment).

Against this backdrop, the specific arguments advanced by the defendants do not stand up. To begin, Chester's argument that the Additional Findings violate the Presentment Clause[40] founders because the Additional Findings are not required to support the convictions on Count One. The Additional Findings are relevant only to the penalty that may be imposed for that violation, pursuant to § 1963(a). As such, the Findings are not elements of the offense and do not set forth a separate "capital, or otherwise infamous crime" that must be separately indicted. And in any event, the indictment charged Chester with conspiring to violate RICO through a pattern of racketeering acts that included the murders of Antonio Bluitt and Keith Daniels. The murder

---

[40] "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." U.S. CONST. AMEND. V.

allegations were presented to the grand jury as part of the conspiracy and Chester does not explain why additional allegations about his role in those murders—beyond his membership in the conspiracy of which the murders were a part—were required by the Presentment Clause, particularly since he was not required to have committed those murders. The Presentment Clause is not implicated here.[41]

The argument advanced by Chester and Ford that there was an unlawful constructive amendment of the indictment as it pertains to Count One also lacks merit. Constructive amendment to an indictment occurs when either the government or the court broadens the possible bases for conviction beyond those presented by the grand jury. *See United States v. Turner*, 836 F.3d 849, 863 (7th Cir. 2016), as supplemented, 840 F.3d 336 (7th Cir. 2016). A constructive amendment occurs only where the offense charged in the indictment is materially different or substantially altered at trial, such that it cannot be known whether the grand jury would have indicted for the altered crime that the government actually proved. *See id*. Here, the jury was instructed on Count One precisely as it was charged in the indictment, and the government's proof correlated with that charge. Chester cites no authority for the proposition that the government cannot "attempt[] to prove a fact that was not even submitted to the grand jury at all." Chester Mot. 9, ECF No. 1192. The grand jury is not a fact-finding body, however, and an indictment need not (and could not) set forth every factual allegation that the government intends to prove. Moreover, the Additional Findings against Ford and Chester were not elements of the federal offense Charged in Count One,[42] so in no way were "the possible bases for

---

[41] Even if the allegations set forth in the Additional Findings were inadequate under the Presentment Clause, that deficiency would not warrant a new trial; it would simply mean that the maximum sentence that can be imposed based on the conviction would be 20 years.

[42] Bush argues to the contrary. He aired that argument fully during trial, and this Court rejected it. He restates the argument in his new-trial motion, *see* Bush Mot. 10-11, ECF 1191:

conviction" on Count One broadened, as Chester argues. The RICO violation for which these defendants were convicted was clearly set out in the indictment and the jury instructions—Count One did not charge any substantive offense, only the conspiracy. And "to prove primary liability for a RICO conspiracy under section 1962(d), the government must prove only that a particular defendant agreed that *a member* of the conspiracy would commit two predicate racketeering acts, not that the particular defendant committed or agreed to commit two predicate acts himself. United States v. *Benabe*, 654 F.3d 753, 776 (7th Cir. 2011). The Additional Findings did not go to the existence of the conspiracy, but only to whether a specific act by some conspirator, and how it was committed, had been proved beyond a reasonable doubt. The purpose of those findings was not to prove Count One. There was, then, no constructive amendment of the indictment in proving facts that established vicarious liability for acts of co-conspirators in furtherance of the conspiracy. *Galiffa*, 734 F.2d at 314-15 (rejecting claim that government constructively amended the indictment by asserting *Pinkerton* liability).

---

"Defendant Bush sought to have the jury make individual findings as to each of the allegations of Count One and Count Three not merely as sentencing enhancements but as elements of the offense. We continue to believe that there is no such thing as a sentencing finding by a jury: there are only simple offenses and aggravated offenses. The government here charged aggravated offenses and therefore must prove them, to the jury's satisfaction, beyond a reasonable doubt, as elements of the offense. The Supreme Court since *Apprendi* has never countenanced a procedure in which the jury may make 'sentencing findings' that satisfies the constitutional command that any fact that alters the maximum sentence or the sentencing range, must be alleged in the indictment, proved beyond a reasonable doubt, and determined by a jury. The Court erred in fashioning the hybrid sentencing findings or special findings for Count One."

Bush has preserved his argument for appeal, but it flies in the face of established Circuit precedent and will not be addressed again here. *See generally United States v. Gilmer*, 534 F.3d 696, 704 (7th Cir. 2008) (facts such as drug quantity go to the severity of the sentence, not the existence of the crime).

Notice is not an issue, either. Both Chester and Ford were defendants named in Count One, which contains multiple references to murders as a major part of that conspiracy. *See* SI ¶¶ 4 (Purposes); 5 (Roles in the Enterprise[43]); 6(d)(i) (Racketeering Conspiracy); and multiple subparagraphs of paragraph 8 (Means and Methods): ¶¶ 8(b), 8(l), and 8(r), the last of which listed specific murders. As relevant to Chester and Ford's arguments, paragraph 8(r)(iii) lists "[t]he murder of Antonio Bluitt, a/k/a 'Beans,' and [as relevant to just Ford] Gregory Neeley, a/k/a 'Slappo,' by DERRICK VAUGHN and others known and unknown to the Grand Jury on or about September 2, 2007." Paragraph 8(r)(vii), which is relevant only to Chester's argument, refers to "[t]he murder of Keith Daniels by PARIS POE and others known and unknown to Grand Jury on or about April 14, 2013."

The Notice of Special Findings for Count One contains allegations about how the Paragraph 8 murders were committed, for the purposes of triggering the potential life sentence allowed by 18 U.S.C. § 1963(a), which, again, provides: "Whoever violates any provision of section 1962 of this chapter shall be . . . imprisoned not more than 20 years (or for life if the violation is based on a racketeering activity for which the maximum penalty includes life imprisonment)." *See* Notice of Special Findings Nos. 2-6, SI p. 13-14, ECF No. 169. Under Illinois law, imprisonment may be imposed for first degree murder if aggravating circumstances are present. *See* 720 ILCS 5/9-1(b).

Paragraph 2 of the Notice refers to the murders of Wilbert Moore (¶8(r)(i)) and Keith Daniels (¶8(r)(vii)), alleging that these murders were committed by the "***named defendant(s)***" to,

---

[43] Ford contends that the lack of notice to him depends partially on the phrasing of the "roles in the indictment"; namely that his "role" did not include "murder," although Chester's did. *See* SI ¶¶ 5(a), 5(f); Ford Mot. 9, ECF No. 1184. Ford's role, however included attempted murder and drug trafficking "among other things." And, again, Ford's alleged "role" in the conspiracy is not determinative of his liability for acts of his fellow conspirators, or his own.

in short, prevent their cooperating with law enforcement or being a witness against "the defendant or another." Paragraph 3 alleges that murders including the Bluitt/Neeley murders (SI ¶8(r)(iii)) and the Daniels murder (¶8(r)(viii)) were committed in a "cold, calculated and premeditated manner" and "the conduct of the *named defendant(s)* created a reasonable expectation" that death would occur as a result.[44]

Ford argues that these portions of the Notice do not pertain to him, because he is not a "named defendant" in Paragraph 8(r)(iii). *See* Ford Mot. 10, ECF No. 1184; Ford Reply 5, ECF No. 1214. The Court accepts and agrees with Ford's reading of the Notice, in that the "named defendant(s)" do not include him. For purposes of the Notice of Special Findings, the "named defendant(s)" in the Bluitt and Neeley murders is Derrick Vaughn alone; *see* SI ¶ 8(r)(iii).

But accepting Ford's interpretation does not mean that the Court finds his broader argument meritorious, because he does not correctly interpret the Findings returned against him on the Bluitt/Neeley murders. A walk through the Additional Findings Instructions and the Additional Findings for Ford demonstrates this.

The Jury returned two Additional Findings against Ford for the Bluitt murder and the same two (but for the victim's name) for the Neeley murder. The pertinent Finding as to each victim was: "As to Count One, we, the Jury find that the racketeering activity upon which defendant William Ford's violation is based upon includes the commission, or aiding and abetting of *the first degree murder* of" Bluitt and Neeley, respectively. This Finding closely tracks the RICO penalty provision, § 1963(a), as quoted above.

---

[44] Other allegations about these murders (that the Bluitt/Neeley murder was a contract killing and that in all the murders the named defendant(s) personally discharged a firearm) are not relevant to the defendants' argument here because Additional Findings were not submitted against them on these grounds.

Turning to the Additional Findings Instruction relevant to this Finding, namely, the instruction on "First Degree Murder," that instruction told the jury that if it found the defendant under consideration—Ford, for present purposes—guilty of the alleged racketeering conspiracy, then it "must determine whether": defendants Chester, Council, Bush, Ford, and Derrick Vaughn[45] "individually or in some combination, committed or caused to be committed the offense of first degree murder as to Antonio Bluitt."[46] The jury was thus told that to find the allegations about the Bluitt and Neely murders proven, it had to find that one or more of the defendants named in the instruction killed Bluitt or caused him to be killed. This is a narrower question than that posed by the corresponding Additional Finding, which, recall, asked simply whether the "violation" (*i.e.*, the conspiracy) as to Ford was "based upon" "the commission, or aiding and abetting of the first degree murder of" Bluitt and Neeley. In other words, the Instruction asked whether one or more of the listed defendants killed Bluitt; the Finding asked only whether Ford's violation of RICO was based upon those murders. For the latter to be true, it matters not whether Ford committed the murder. All that matters is whether the RICO "violation"—in other words, the conspiracy—was based upon racketeering acts that included the Bluitt murder. Under conspiracy law, it would not matter which conspirator committed the murder.

But, as noted, the instruction required the jury to make a finding that went beyond the minimum required for liability under conspiracy law. The variance in phrasing is not, however,

[45] This instruction refers to every trial defendant except Paris Poe, as to whom there was no evidence of participation directly. Although it could have done so, the Government chose not to assert that Poe was liable, directly or vicariously, for this crime—presumably because he was incarcerated at the time and there was no evidence submitted that he was in on the planning or that these particular murders were foreseeable to him.

[46] The next finding is identical but for omitting Chester's name (the government attempted to prove only his connection to Bluitt as a victim) and substituting Neeley as the name of the victim.

inconsistent with the finding, and it certainly did not work any prejudice to Ford. The instruction told the jury to find as a factual matter that Chester, Council, Bush, Ford, and/or Derrick Vaughn, alone or in any combination, personally committed or aided and abetted the Bluitt murder. It needn't have done so, but for whatever reason, the government decided to identify the possible killer(s) by name while leaving open the question of which specific defendant(s) did the deed. That is perfectly consistent with both § 1963(a) and the Additional Finding, which ask only whether the conspiracy was based upon racketeering acts including the named murder.

Once the jury answered that question affirmatively, Chester and Ford were subject to the enhanced penalty of a potential life sentence, because it was established beyond a reasonable doubt that a member of the conspiracy committed the murder of Bluitt and did so in a cold, calculating, and premediated manner, such that under Illinois law, the offense would be punishable by life imprisonment. *See* 720 ILCS 5/9(b)(11).

Now back to the question whether Ford and Chester were given notice in the Superseding Indictment that these findings could be entered against them and used to increase their sentences. They were. Again sticking with the Bluitt example, the Notice of Special Findings at Paragraph 3 alleges that the Bluitt murder (¶8(r)(iii))) was committed in a "cold, calculated and premeditated manner" and "the conduct of [***Derrick Vaughn***] created a reasonable expectation" that death would occur as a result of the preconceived plan. Although Derrick Vaughn is the only "named defendant" in ¶8(r)(iii), the notice provision places ***every defendant*** on notice that a murder was committed by Derrick Vaughn in a cold, calculated, and premeditated way. Therefore, the conspiracy—the RICO violation—was "based upon racketeering activity" (the murder of Bluitt in a cold, calculating, and premeditated way) for which the maximum penalty includes life imprisonment." 18 U.S.C. 1963(a). The question for purposes of § 1963(a) is whether ***the***

*conspiracy* involved a life-eligible crime; it is not whether Ford or Chester killed Bluitt (or Neeley, or Daniels). And that is where Ford and Chester's arguments run aground.

The government took a different route to implicate Chester in a life-eligible murder. The government submitted a jury instruction on *Pinkerton* liability and Additional Findings that matched the instruction: that the Bluitt murder and the Daniels murder were committed by one or more of Chester's co-conspirators "whose acts (1) advanced the goals of the conspiracy; and (2) were reasonable foreseeable to defendant Chester." This route leads to the same destination: the conclusion for purposes of § 1963(a) that Chester's RICO violation of conspiring to violate RICO was based upon racketeering acts for which the maximum penalty includes life imprisonment.[47] Again, the indictment placed Chester on notice of this possibility. Paragraph 8 and the Notice of Special Findings alerted him that the government would attempt to prove that the conspiracy involved (1) the murder of Bluitt by (at a minimum) Derrick Vaughn in a cold, calculating, and premeditated way, and (2) the murder of Daniels by, at a minimum, Paris Poe (a) in a cold, calculating, and premeditated way; (b) with the intent to prevent Daniels' testimony or participation in an investigation; and/or (c) because he had been a witness or had given material assistance to law enforcement. If the conspiracy was based upon these acts, then Chester's participation in the conspiracy (his "violation" of RICO) subjected him to the potential life sentence provided for by 720 ILCS 5/9-1(b)(8) (witness murder) or 720 ILCS 5/9-1(b)(11) (cold and calculated), by way of § 1963(a).

---

[47] For the murder of Bluitt, the penalty of life would be based on the finding of a cold, calculated, and premeditated murder. For the murder of Daniels, it would be for the same reason, as well as for the intent to prevent Daniels from testifying or participating in an investigation (a forward-looking reason), and for Daniels' having been a witness or having given material support to law enforcement (a backward-looking reason).

This analysis has been in response the defendants' argument about lack of notice. But it is also why Ford's *Apprendi* argument fails. He argues that the Additional Findings by the jury, which increase his statutory maximum punishment under § 1963(a), were not charged in the indictment. *United States v. Cotton*, 535 U.S. 625, 632 (2002) (indictment's failure to allege a fact that increased the statutory maximum sentence rendered defendants' enhanced sentences erroneous); *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000) ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."). Ford's argument is based on the faulty premise that his potential maximum sentence was raised above 20 years based upon a fact (found beyond a reasonable doubt) that was never charged in the indictment—that Ford ***personally*** committed or aided and abetted the commission of the Bluitt and Neeley murders. *See, e.g*., Ford Mot. 5 (Ford "never charged with" the murders of Bluitt and Neeley); 11 (indictment alleged "nothing in relation to the murder'); 12 (not no notice "from face of indictment"), ECF No. 1184.

As discussed above, the premise is true but the argument is misplaced. The fact that made Ford eligible for an enhanced sentence was his agreement that the RICO conspiracy would include the Bluitt/Neely murders—an agreement evidenced by his own participation in those murders. He would have been no less eligible for a life sentence if he had not participated in the murders personally so long as the requirements of *Pinkerton* were met. Case in point: Gregory Chester. Only the VICAR defendants were "specifically indicted" for any murders; meanwhile, every defendant including Chester was charged with conspiracy to violate RICO through a pattern of racketeering activity that included murders. The grand jury needn't have considered whether Ford or Chester were personally involved in the Bluitt and Daniels murders, and the

indictment was not required to set forth the legal theory of responsibility by which the government intended to prove his responsibility for those murders. It is enough that the indictment charged that the murders were committed as part of the conspiratorial agreement that Chester joined.

The government's approach tracks the Seventh Circuit's teaching in *Benabe. See* 654 F.3d at 777. Under conspiracy law "***responsibility for***" murder does not mean ***commission*** of murder. It is well settled that under *Pinkerton*, criminal responsibility extends to any foreseeable act that is committed by any conspirator in furtherance of the conspiracy.[48] This was all aired at trial, particularly in the discussions found in the trial transcripts at Volume 17, pages 10996-11020 and Volume 29 at 11548. *Benabe*'s discussion focused on *Pinkerton* liability and suggested that a *Pinkerton* instruction was needed to hold one co-conspirator accountable for the acts of another. 654 F.3d at 777. Even so, the government limited its proposed *Pinkerton* instruction to defendant Chester, taking on a greater burden of demonstrating criminal responsibility of other defendants by means of evidence of their personal involvement in the life-eligible racketeering acts by means of direct participation or aiding and abetting (something the evidence likely did not permit as to Chester). In any event, the submission of Additional Findings to the jury for a determination beyond a reasonable doubt that the defendants were criminally responsible for life-eligible racketeering acts was perfectly consistent with *Apprendi*,

---

[48] This perhaps raises the questions of why Ford and Chester were singled out for these Additional Findings on first-degree murder and why a *Pinkerton* instruction was requested for Defendant Chester. But the findings the government sought arguably went beyond its burden of proof, so Chester and Ford cannot be heard to complain about that. And, as noted, the government followed the lead of *Benabe*. And because Chester and Ford were the only trial defendants not charged in separate VICAR counts, the government cannot be blamed for proceeding cautiously if it wished to seek the maximum penalty in the event of a conviction.

as the Seventh Circuit held in *Benabe*. 654 F.3d at 777 ("Such a jury finding was necessary to comply with the requirements of *Apprendi*.").

Now to the defendants' individual claims of error.

## B.    Chester's Assertions of Error

Defendant Chester argues that numerous other errors prejudiced him and entitle him to a new trial.

### 1.    Pretrial and Trial Errors Generally

Chester raises several errors that were previously ruled upon by the Court (though Chester provides no record citations for those rulings nor his motions and oral arguments) without new argument about why the rulings were erroneous and how they specifically prejudiced Chester. Without specific argument about defects in the Court's reasoning or specific allegations of prejudice, the Court stands on its prior rulings on these issues, which include: the admission of evidence of the search of his Dearborn Street apartment pursuant to a search warrant (the subject of a *Franks* hearing); the admission of co-conspirator statements as statements against penal interest under Rule 804(b)(3) although they were not admissible as non-hearsay as statements of co-conspirators under Rule 801(d)(2)(E); and the denial of the motion to dismiss the indictment based upon the perjured grand jury testimony of Byron Brown. As to this argument, the Court will add, in the wake of the jury's verdict, that a trial jury's guilty verdict renders an error in the grand jury proceedings harmless. *United States v. Mechanik*, 475 U.S. 66, 73 (1986); *United States v. Montez*, 858 F.3d 1085, 1091 (7th Cir. 2017); *United States v. Morgan*, 384 F.3d 439, 443 (7th Cir. 2004). The verdict here wiped out any error in the charging process because the conspiracy and Additional Findings were proved beyond a reasonable doubt. Whether or not Byron Brown's false testimony was the primary evidence that led the jury to

charge Chester, the petit jury was wholly unaware of it and still found Chester guilty beyond a reasonable doubt.

### 2. Admission of Chester's October 22, 2008, statements to police

Defendant Chester contends that this Court erred by allowing the government to present evidence of his statements to police on the night he was seized along with Walter Binion and interviewed at the Homan Square police station. He contends that his statement was fruit of an illegal seizure and therefore should have been suppressed. This Court denied Chester's motion to suppress the statement, after a full hearing at which Chester testified, as did (then) Sergeant James Sanchez of the Chicago Police Department and Special Agent Bryant Hill of the FBI. *See* Order, ECF No. 719. The Court reasoned that, although it agreed with Chester that the police lacked a basis to suspect that Chester was engaging in any criminal conduct when they stopped him,[49] the seizure was not unlawful because they had another basis for a valid seizure. Several months earlier, in June, the police obtained a warrant to search Chester's Dearborn Street apartment, and the search yielded almost 100 grams of heroin. Chester maintains that this ruling was erroneous because he was really stopped for another reason (to see if he could be "flipped") and because the government did not sufficiently establish a connection between Chester and the heroin recovered at the apartment in any case. The Court agreed with Chester that there was no reliable, credible evidence that the police had reasonable suspicion to commit a *Terry* stop,[50] but that whatever the officers' subject intent was to pull over the car, probable cause existed before the stop and, therefore, the police were entitled to seize Chester.

---

[49] The government says in its current brief that there was a "traffic stop," Govt. Resp. 72, ECF No. 1207, seemingly invoking *Terry v. Ohio*, even though at the suppression stage it withdrew any argument that there was a basis for the stop other than the probable cause to arrest.

[50] The Court concluded that the account of the stop of Chester's vehicle provided by Sanchez was not credible and was therefore disregarded. No other officer with knowledge of the stop testified.

In its post-hearing brief on the suppression motion, the only basis on which the government argued the stop was justified is as follows: "The government submits that justification for the traffic stop arose simply by reason of the June 26, 2008 search, during which CPD recovered 99.6 grams of heroin. To the extent other potential bases for the stop were addressed when then-Sergeant James Sanchez testified during the hearing, including information received from a confidential source of information, the government is not relying on those proffered reasons and asks that the Court not consider them in determining whether officers had reasonable suspicion on October 22, 2008, to conduct the stop." Gov. Post-Hearing Br. 2, ECF No. 569. On that point, the Court held: "Both Detective Brogan's report [concerning the search of the apartment] and the trial testimony establish that nearly 100 grams of heroin was recovered from the apartment; furthermore, the affidavit in support of the search warrant (which the government submitted as part of its response to the motion) establishes Chester's connection to the apartment. Under the totality of the circumstances, therefore, police had probable cause to arrest him for, at least, drug possession." Order 6, ECF No. 719.

Chester argues that this is based upon a misreading of *Utah v. Streiff*, 136 S. Ct. 2056 (2016)—but his argument is based on a misreading of the Court's ruling. As Chester argues, *Streiff* provides no support for admitting the evidence. That is why the Court expressly noted that Streiff was inapplicable because it was an attenuation case (in which the officer had learned of an outstanding warrant during the course of illegal stop), and in this case, "[t]he police had this information before the stop, and this is therefore not a case of attenuation created by the discovery of an arrest warrant during an unlawful stop, as in the recent case of *Utah v. Streiff*." Order 16, ECF No. 719. The Court did cite Justice Sotomayor's blunt summary of the law

regarding pretextual stops in her dissent in *Streiff*,[51] but Chester's argument to the contrary—that the officer's subjective state of mind matters to the validity of the search—is, as Justice Sotomayor acknowledged in *Streiff*, not a correct statement of the law.

Chester argues that, in any event, the stop cannot be justified by probable cause because the record lacks any evidence that the officers who pulled over Binion's car had any knowledge of the apartment search. He contends that knowledge of probable cause at the time of the stop is required if probable cause is the legal basis for that stop.

But the Court already determined after the suppression hearing that the police "had this knowledge [of the drug recovery] before the stop." In particular, then-Sergeant Sanchez, who was in the first car to stop Chester, was the leader of the team that obtained the search warrant and was involved in the search, and subsequently talked to Chester about the search when Chester was taken to Homan Square, plainly had knowledge of the discovery of 100 grams of heroin during the search. Of course, this Court found that Sanchez's hearing testimony about the stop could not be credited, but the fact of his involvement in the search is objective and easily ascertainable, so there is no basis to discredit that aspect of his testimony. Sanchez's knowledge of the Dearborn search was also corroborated by Detective William Brogan, who also questioned Chester on October 22, 2008. His report of the interrogation states: "It was also explained to Chester that Team 6565 had executed a search warrant on a suspected residence of Chester's." *See* Govt. Resp. to Mot. To Suppress Ex. 2, ECF NO. 400. Taken together, this evidence was sufficient to establish that the officers who seized Chester on October 22, 2008 knew that there

---

[51] "This Court has allowed an officer to stop you for whatever reason he wants—so long as he can point to a pretextual justification after the fact." *Streiff*, 136 S. Ct. at 2069 (Sotomayor, J., dissenting).

was probable cause to arrest him, whether they intended to do so at the time or not. The suppression of the evidence was not warranted.

### 3.    *Pinkerton* Instruction on Chester's Liability for Daniels Murder

Chester also argues that the *Pinkerton* charge in the Additional Findings Instruction prejudiced him because he was the only defendant about whom the jury received the instruction. This, Chester argues, suggested to the jury that he was "specially responsible" and that "he is clearly established to the boss, and that, as the boss he is guilty of everything his co-conspirators did." Chester Mot. 8, ECF No. 1192.

There is no requirement that *Pinkerton* instructions must be given to all defendants or none; certainly, Chester cites no authority for that proposition. The claim of prejudice, moreover, is weak. Notably, the *Pinkerton* instruction was given (again, consistent with *Benabe*'s teaching) only in the Additional Findings Instructions. Therefore, if the jury hadn't convicted Chester on Count One first, it would not have reached the Additional Findings, so certainly Chester incurred no prejudice with respect to the jury's determination of his guilt on the conspiracy charge. Chester gives no reason to doubt the presumption that the jury followed the clear instructions it was given. Moreover, Chester is the last defendant who could be crying foul about prejudice for being singled out. If he stood in contrast to his codefendants by virtue of the jury instructions, it was to his benefit since he was one of only two defendants who was not mentioned in direct connection to a murder during the General Instructions that preceded the Additional Findings Instructions. And far from sending a message that Chester was the most culpable Hobo, the government's reliance on a theory of *Pinkerton* liability would have suggested that the government lacked evidence to support an argument that Chester was personally involved in the murders.

### C.    Council's Assertions of Error

Defendant Council does not identify any specific errors that he contends require a new trial. *See* Council Mot. 21, Section II.1-3, ECF No. 1186. He adopts his co-defendants' arguments to the extent they apply equally to him (something this Court has allowed), and preserves the issues he raised at trial and before trial. Finally he argues that the cumulative effect of trial errors requires a new trial. Accordingly, there is nothing to discuss separately with respect to Council's motion for a new trial.

### D.    Poe's Assertions of Error

Like Defendant Council, Defendant Poe does not argue that any specific errors require a new trial. Poe Mot. 22, Section II, ECF No. 1188. He reasserts every issue raised in writing or orally by motion or objection before and during trial, incorporates his co-defendants' arguments as applicable to him, and states that individually or cumulatively the court's errors require a new trial.  Having identified no specific errors, Poe gives the Court no basis on which to reconsider its prior rulings, and no further discussion of his request for a new trial is required.

### E.    Bush's Assertions of Error

Defendant Bush raises no fewer than a dozen issues, all of which (independently or cumulatively), he says, require a new trial. All of them were the subject of written and/or oral argument and largely written, but sometimes oral, rulings. Bush never refers back to this Court's reasoning to explain why it was incorrect or how, specifically, the error prejudiced him and is likely to have impacted the verdict. Indeed (with the exception of his prosecutorial misconduct argument), in his motion Bush does not cite a single motion, written ruling, oral argument, or oral decision so as to enable the Court to examine the issues without combing through the entire docket and trial record.

### 1. Pretrial Rulings Generally

Bush lists the following purportedly erroneous pretrial rulings: the denial of the motion to dismiss Count One for failure to state an offense and for untimeliness; the denial of the motion to dismiss based on double jeopardy; the denial of his motion to suppress the search of his Midlothian residence; the denial of the motion to exclude the identifications of Bush by Antonina Pellagrino, an eyewitness to the Bogovich murder; and the denial of the motions to sever defendant Poe and/or Count Six. Having failed to set forth any new reasoning as to why the decisions on these issues merit reconsideration, nor any specific prejudice to Bush, this Court stands on the reasoning of its prior rulings.

### 2. Trial Rulings Generally

Next, Bush takes issues with the following purportedly erroneous trial rulings: allowing evidence of the defendants' admissions of guilt of certain crimes in state court (because it was in contravention of the presumption of evidence, it was improper to view the pleas as "admissions"); admitting evidence of crimes committed by Bush and the other defendants, as well as conspirator statements about offenses that "had no relation to the charged conspiracy"; the denial of an instruction on the statute of limitations; and the use of "Additional Findings" to discern facts relevant to the defendants' sentences instead of requiring those findings to be made as elements of the relevant offenses. In the absence of any new reasoning as to why the decisions merit reconsideration, nor any specific prejudice to Bush, this Court stands on the reasoning of its prior rulings.

### 3. Specific Allegations of Error

#### a. Admission of Redacted State-Court Guilty Pleas into Evidence as Admissions of Party-Opponents

The Court allowed into evidence redacted transcripts of various defendants' pleas of guilty to crimes in state court. Denying the government's request to admit the entirety of the plea transcripts (such as the recounting of the alleged facts of the crimes), the Court limited the evidence to the charge explained to the defendant and his answer of "guilty" when asked how he wanted to plead. *See* Order, ECF No. 529. These statements of guilt were admissible against a defendant as admissions of a party-opponent, and the Court instructed the jury that the evidence could be considered only against the defendant who made the admission.

Bush claims that this was error, as was the "truncated presentation of transcripts." Bush Mot. 5, ECF No. 1191. Bush offers no analysis or authority to support his assertion that the statements were "unduly prejudicial and not proper as admissions." *See id*. The Court has already explained the reasoning behind, and the authority for admitting the redacted plea agreements as party admission and for holding that the pleas, while "prejudicial," were not unduly so. *See* Orders, ECF Nos. 529, 785. Absent any substantive argument from Bush, the ruling stands.

As for the second issue, the paring down of the transcripts, Bush's conclusory argument is not persuasive. Bush, for "completeness" or "context" wanted to suggest to the jury that in pleading guilty to second-degree murder with mitigation, he was getting a huge break from a first-degree murder charge and would have been crazy not to accept the plea even if he were innocent.

First, the Court redacted the transcripts to avert prejudice ***to the defendants*** by strictly construing which portions constituted "admissions." *See, e.g,*. Order 5, ECF No. 529 (transcript

portions containing "stipulations that the state's witnesses would provide additional facts" not admissible as "context" because "the government is simply seeking to use those additional facts as further substantive evidence.")[52] Second, Bush does not even attempt to apply the Rules of Evidence to his alternative (to inadmissibility) proposition that the entire plea transcripts should have come in. *See* Bush Mot. 5, ECF No. 1191 ("[I]f the pleas were going to be admitted, their entirety should have been presented to the jury to give the jury the full context in which the admissions were made."). The transcripts are out-of-court statements offered (by either the government or the defendant) for their truth; as such, the statements must satisfy some exception to the rule against hearsay (or be non-hearsay). It makes no difference whether the government or the defendant is proffering the evidence. Bush's reference to "full context" is perhaps a woefully underdeveloped nod to Federal Rule of Evidence 106, or the "rule of completeness." That rule holds that a complete statement must be read or heard when it is necessary to (1) explain the admitted portions, (2) place the admitted portion in context, (3) avoid misleading the trier of fact, or (4) insure a fair and impartial understanding. *United States v. Ambrose*, 668 F.3d 943, 964 (7th Cir. 2012). The context of the statement was clearly a criminal court proceeding, and Bush does not say how the remainder of the transcript would "explain" what Bush stated or avoid misleading the jury.

Furthermore, if context and explanation are Bush's concerns, he fails to note that these are among the concerns that prompted this Court to permit the testimony of a defense expert, Judge A.C. Cunningham, regarding the Cook County criminal justice system and the factors other than guilt or innocence that factor into the decision to enter a plea. *See* Order, ECF 966; Trial. Tr. Vol. 47. The message that Bush wanted to send—that people enter pleas to get out jail,

---

[52] This transcript relates to defendant Poe, who filed a motion *in limine* making the same arguments as Bush, but the same approach was followed with respect to Bush.

avoid long prison sentences, get back to their families, *etc.*—was conveyed by an expert in a direct way, whereas the jury would have had to draw an inference from the plea transcript about Bush's possible motive for pleading guilty. Moreover, the Court put no restrictions on Bush's ability to introduce evidence relating to the relative penalties he faced between charges originally levied against him and those to which he was permitted to plead. In light of Judge Cunningham's testimony, and the Court's related evidentiary rulings, Bush fails to demonstrate that he was prejudiced by the Court's decision to redact all guilty-plea transcripts down to the core non-hearsay statements unless otherwise agreed by the parties.

b.      **Unrelated Crimes by Bush and Other Defendants**

Bush contends that it was error for the Court to admit evidence of crimes by him and other Hobos that were "unrelated" to the charged conspiracy. He mentions only the murder of Steven Bogovich by Bush on November 24, 2006, an offense that Bush was acquitted of in state court. Before trial, this Court denied a defense motion, *see* ECF No. 598, to exclude evidence of acts outside the charged conspiracy. *See* Order, ECF No. 782 at 5-8. Although the motion did not list the Bogovich murder[53] among the purportedly unrelated acts, the Court's reasoning applies equally to this murder. Further, this murder was directly related to Bush's (high-stakes) drug trafficking activity and implicated, at a minimum, Arnold Council and Stanley Vaughn in the lead-up to or aftermath of the murder. In particular, Council and Bush's surveillance of the drug deal that went bad, leading to the murder, is consistent with a modus operandi distinctive to the Hobos. (Consider also that Bush sent his money with a younger associate to make the deal, rather

---

[53]  At trial Bush objected that that the jury would not understand what to make of an uncharged murder, and further that "there's not going to be any evidence that this was a Hobo crime." Trial Tr. Vol. 11 at 2786-88. He had also previously objected on double jeopardy grounds. *See id.* at 2586; Mot., ECF No. 536. The Court rejected that argument, *see* Order 4, ECF No. 785.

than personally participating, just as the high-level Hobos tended to stay far removed from the street level of their operations.) The murder was also squarely within the means and methods of the charged conspiracy: here, murder in retaliation for ripping Bush off in a drug deal. The murder occurred in Chicago during the time frame of the conspiracy. There is only Bush's say-so that this murder was not related to the Hobos' activities, but the evidence at trial showed otherwise. At a minimum, this uncharged predicate act provided evidence of the existence of a pattern of racketeering activity including murder, as well as Bush's and Council's knowing agreement to participate in the conspiracy.

Bush's claim of prejudice rings hollow. If the Bogovich murder were an isolated act of murder or drug trafficking by Bush, then it might be said that the prejudice was significant. But in the trial, Bush was implicated in a host of other murders and shootings, as well as extensive drug trafficking. The taint of the Bogovich murder was unlikely to have had a prejudicial effect on the jury's deliberations about Bush's guilt. Indeed, as an uncharged predicate act, and one about which no Additional Allegations were required, the evidence relating to the Bogovich murder likely figured much less prominently in the verdict than did the evidence of the other murders and shootings that was introduced against him.

Bush does not refer specifically to evidence of any other uncharged act committed by him or other members of the conspiracy that was erroneously admitted and was not harmless. His generalized claim of error in this respect therefore does not warrant further discussion.

### c.     Alonzo Cole's Prior Grand Jury Statement

At trial Bush sought to put in evidence the prior testimony under oath (in a grand jury proceeding in the state-court Terrance Anderson case) of Alonzo "Fat Shorty" Cole, who died before this trial. *See* Mot. In Limine, ECF No. 1047. That evidence was "powerfully

exculpatory," Bush contends (Mot. 10, ECF at 1191), in that Cole stated that he was armed with .357 Magnum at the outdoor party where Anderson was killed, that multiple people were shooting, including himself, and that he did not see Bush shoot Anderson. Therefore, he says, it was error to exclude the statements.[54]

The Court initially ruled to exclude this evidence upon concluding that the Cole was not cross-examined about the facts or his own biases and credibility generally by anyone with a motive similar to the prosecutors in this case. Trial Tr. Vol. 50 at 11624 -11627. The nature of grand jury proceedings fundamentally differs from a trial; there is a different burden of proof; and the purpose of the testimony might simply be to get the witness on the record. The Court also ruled that the testimony could not come in as a statement against penal interest, because only small, discreet bites of the testimony could possibly meet that definition. Bush then asked to put in those isolated statements: "at least that portion in which Mr. Cole acknowledges possessing a .357 Magnum and firing in the direction of Terrance Anderson." *Id*.

Days later, the government and Bush stipulated to the admission of those statements. Trial Tr. Vol. 52 at 12250-12253. But then the government pointed out that if Cole's statement came in, it had a right to impeach the hearsay declarant, which would open the door to evidence showing Cole's bias or prior inconsistent statements—some of which would implicate defendants other than Bush. See *id*. at 12254. For example, Cole said in his grand jury statement that before he testified against Bush in the state-court murder trial, he was intimidated by Chester and others outside the courthouse. He therefore had a motive to change his testimony from what

---

[54] Bush's argument on this issue should be deemed waived based on his failure to develop it as well as his failure to identify citations to the record for the briefing on his motion, any transcript or stipulation he proffered as evidence, or any discussion on the record. The government's response, however, provided enough record citations for the Court to address the substance of the argument.

he told the state grand jury. Cole also had testified inconsistently about at whom he fired his gun. Defendant Chester objected to the stipulation; defendant Council expressed concern about what impeachment the government might offer. In light of those objections, Bush's counsel stated: "I'll withdraw the stipulation at this time" to avoid a "procedural nightmare." *Id*. at 12259.

Bush not only fails to say why "the Court erred in excluding this testimony," (which is not the full story, as recounted above), he does not acknowledge his own withdrawal of his request to admit it. The Court did not ultimately "exclude" anything because it did not have to make a ruling. Bush's strategic decision to withdraw the stipulation (*i.e*., not to put forth the evidence) waived any challenge to the exclusion of the statements. "[W]hen there are sound strategic reasons explaining why counsel would elect to pursue a route as a matter of strategy," then any objection is waived. *United States v. Kennedy*, 726 F.3d 968, 975 (7th Cir. 2013) (quoting *Swanson v. United States*, 692 F.3d 708, 716 (7th Cir. 2012)); *United States v. Perez*, 612 F.3d 879, 885 (7th Cir. 2010) (waiver clear where trial court was ready to allow a line of questioning but the defendant decided to "move on"). The waiver applies equally to the unredacted transcripts because Bush would have faced the same objections to the admission of Cole's testimony in its entirety: the government would have sought to introduce the same impeaching information implicating other defendants, triggering the same objections that the introduction of the redacted statements provoked and which prompted Bush's counsel to abandon the effort.

### d.     Statute of Limitations Instruction

Bush argues that the Court erred in denying his proffered "statute of limitations" instruction (actually labeled "Isolated Acts") that would have required a specific finding that the conspiracy continued into the five-year limitations period before September 26, 2013. Bush's

proposed instruction[55] would have "required the jury to find that the conspiracy alleged continued past September 26, 2008 so that the return of the indictment was timely." Bush Mot. 10, ECF No. 1191. Bush contends that without this instruction, "it is not clear that the jury found that the conspiracy identified in Count One in fact did continue into the limitations period." *Id*.

When a crime is a continuing one, like a conspiracy, the statute of limitations does not begin to run when all elements are first present, but rather begins when the offense expires. Therefore, for a conspiracy offense, the statute of limitations would not run from the time of the first overt acts, but instead would run until the conspiracy ended, *United States v. Schiro,* 679 F.3d 521, 528 (7th Cir. 2012), a point measured at the earliest from the occurrence of the last act in furtherance, *United States v. Yashar*, 166 F.3d 873, 875–76 (7th Cir. 1999).

Here, the Superseding Indictment charged that the defendants agreed to participate in a pattern of racketeering activity "beginning no later than in or about 2004, and continuing until in or about 2013." SI ¶ 6.[56] Bush could have proposed an instruction to the effect that the jury must find the defendants "not guilty" if it concluded beyond a reasonable doubt that all of the goals of the conspiracy were accomplished before September 26, 2008, or that the defendant under consideration had withdrawn from the conspiracy before that date. Instead, Bush attempted to shift the burden of proof on an affirmative defense over to the government to prove in the first

---

[55] "An isolated act of racketeering is not part of a pattern of racketeering which is a necessary element as defined within these instructions. It is the theory of the defense that the attempted murders of the Castro brothers, the intimidation and murder of Keith Daniels, as well as the Collections Store Robbery were isolated acts of violence and not predicate acts in furtherance of the RICO Enterprise. In order to premise a defendant's membership and guilt of count one you must unanimously find beyond a reasonable doubt that one of these alleged predicate acts, in addition to at least one of the remaining predicate acts found in Count one, was performed as a common objective and a goal of the Enterprise." Defendant Bush's Instruction No. 2, ECF No. 1060 at 6.

[56] The jury's verdicts on Count One inherently include the finding that the racketeering conspiracy as described in the Superseding Indictment existed.

instance. The commission of the crime within the statute of limitations is not an element of the offense and not part of the government's burden to prove. *Smith v. United States*, 568 U.S. 106, 112 (2013). It is the defendants' burden to establish untimeliness if they raise the defense. *See id.* Therefore, any jury instruction requiring a finding that the conspiracy continued into the limitations period would improperly shift the burden of proof on an affirmative defense from the defendants.

Bush's argument also goes to his consistent misapprehension of what the government is required to prove in a RICO conspiracy case. As relevant here, and explained in *United States v. Tello,* 687 F.3d 785 (7th Cir. 2012) and *Benabe* among other cases, there is no requirement that specific predicate acts be alleged or proved. Therefore, Bush's focus on knocking three specific offenses—the Castro home invasion, the Collections store robbery, and the Daniels murder—out of the case as "unrelated" crimes is futile.[57] The conspiracy could have continued irrespective of whether, or when, these three acts occurred and were part of it. "For conspiracy statutes that do not require any overt acts, the conspiracy 'continues' for limitations purposes as long as its purposes have not been abandoned or accomplished." *Yashar*, 166 F.3d at 876. Bush is also far off-base in arguing that the jury should have been instructed to decide whether certain alleged predicate acts were "isolated" from the conspiracy. That's argument; it is not an instruction of law. And because a RICO conspiracy can be proved without proving any specific predicate act at all, the jury did not have to believe that the Collections robbery, the Castro home invasion, or the

---

[57] It bears noting as well that the offenses that Bush clings to are not the only evidence that the conspiracy continued well into the limitations period. For example, in 2012, William Ford was plotting from prison to resume a drug-trafficking operation, and he expected help from Chester when he was released. And Ford was caught with a distribution quantity of marijuana and a gun in 2015. He also spoke of the Hobos as a going concern, not an operation that had shuttered in 2008 when Bush went to jail. Also, Defendant Chester continued to supply heroin to other Hobos associates, such as Keith Daniels, up until his arrest in 2013.

Daniels murder occurred at all in order to find the defendants guilty on Count One. The same general principle supports the denial of an instruction requiring findings that the three offenses were committed in furtherance of the conspiracy. The RICO conspiracy is proved if a member agreed to participate in the enterprise, which is demonstrated by the knowing agreement that a member of the conspiracy would commit two or more racketeering acts. Those acts, by definition, must have been within the scope of and in furtherance of the conspiracy. But isolating specific acts is not required. Bush's requirement that a jury find particular acts to have been committed in relation to the conspiracy is fundamentally at odds with that principle. Where no predicate acts need to be proved to establish the existence of the conspiracy, Bush has no grounds for insisting on jury findings about the timing or relatedness of any particular racketeering act.

### f.    Prosecutorial Misconduct in Closing Argument

Bush renews his arguments that the prosecutor impugned the integrity of defense lawyers and prejudiced the jury by commenting on the motto of jailhouse lawyer Brian Zentmyer, who testified that he told his jailhouse "clients": "You tell me the truth, let me do the lying." Trial Rr. Vol. 43 at 10175.[58]   In its rebuttal closing argument, government said of Zentmyer's motto:

---

[58] Zentmyer testified that he told fellow inmates that he needed to understand the truth if he was going to be able to help them. The full exchanges (there were two) between Zentmyer and defendant Poe's counsel are set forth below:

> Q: And you've told us that you tell everyone routinely, the only way I could help you is if you fully confess to our crimes, right?

> A: I didn't say "fully confess." My thing is—and I have told this to the prosecutor. I've told it to my attorney. *You tell me the truth, let me do the lying.* That's exactly how I say it.

> Q: So you tell – you've helped numerous people by saying to them the only way I could help you is if you tell me the truth about your case, meaning you have to admit to me if you did it, right?

"Yeah, he said he learned that from a lawyer, someone who had represented him." Trial Tr. Vol. 56 at 13358. Bush's counsel raised a vigorous objection at sidebar as soon as the argument was over and sought an instruction that told the jury "that when we get up, we're not trying to trick the jury." *See id.* at 13372. At that time, when both the Court and Bush's counsel thought the prosecutor's comment had been limited to "I learned that from a lawyer" (as distinguished from "a lawyer, someone who had represented him"), the Court said: "Overruled. You're lawyers. The prosecutors are lawyers. There was — in the same fashion, there was commentary about the motives of defense lawyers and making arguments or presenting the evidence that was — they presented, so too were their arguments that ascribed ill motives to the prosecutors in their presentation of the evidence." The issue was raised again after the jury was instructed *Id.* at 13452 ("But they're now going to consider the fact that lawyers teach clients to lie because we're

---

A: Most—I think most attorneys would want to know that as well, you know. If you're going to need to defend a client, you need to know what's going on.

Q: You'll maybe have to retake that legal class you took.

Subsequently, Poe's counsel returned to the subject (at 10235):

Q: And what you said was, 'Tell me the truth and I'll lie for you,' right?

A: It's just a general statement.

Q: But that's what you said, isn't it?

A: Okay. That's—it's—okay. That's what I said, but it's just a general conversation between two people when I tell them like jokingly. I'm not going to—but if I go to an attorney, I have to speak to them what I did for them to defend me. They don't go up and tell on me. They—

Q: What you said is—

A:—have to come up with a defense.

the best liars in the world. We're paid to lie. That is the only way that comment can be taken.")
The Court said: "[M]y recollection is the comment was an accurate comment on evidence that
was presented during the trial, and the comment certainly did not single out defense lawyers. The
comment was 'a lawyer.' And as I pointed out, both sides are represented by lawyers in this case,
and both sides have made allegations that lawyers on the other side have mischaracterized,
misrepresented or otherwise proceeded in a manner calculated to deceive the jury." *Id.* at 13454.

Bush's post-trial argument is effectively the same: that the government not only "put its
own gloss" on Zentmyer's remarks, but that it did so in a way that directly impugns the integrity
of defense lawyers and implies that they all use a dirty tactic. Bush Mot. 11-14, ECF No. 1191.
The government says that the remark was not improper because it was just responding to Paris
Poe's argument that Zentmyer was an admitted liar, putting the "motto" in the context of his
representation of his "clients," from whom he needed the truth in order to give advice, not his
attitude generally. Govt. Resp. 109-113, ECF No. 1207. It also argues that there was no
prejudice, even if the remark was improper. *Id.*

The government brushes off the comment as not implying that Zentmyer learned the
motto from a "defense" attorney or any lawyer for these defendants. While the latter statement is
certainly true, the former is questionable, upon a closer view of the record. Zentmyer attributed
his "I'll lie for you" motto to "someone who represented [him]" which in this context (prison)
was most likely to connote a criminal defense attorney. Moreover, the government's position
ignores the fact that the "he learned it from a lawyer" comment, with or without the addendum
"someone who represented him," was never said. Zentmyer never attributed the saying to
lawyers generally, or to a defense lawyer specifically. The government's comment, however,
did.

In reviewing a claim for prosecutorial misconduct, the Court first inquires whether the alleged misconduct was in fact improper and second whether it prejudiced the defendant. *United States v. Nunez*, 532 F.3d 645, 652 (7th Cir. 2008). Had the prosecutor accurately quoted Zentmyer, there would be no error; it is not improper to accurately describe evidence presented at trial. But Zentmyer did not attribute his motto to a lawyer who represented him, and the prosecutor's inaccurate version of Zentmyer's testimony could reasonably have been interpreted as a dig on defense lawyers or as a suggestion that defending those accused of crimes requires lying for the client. It would be improper for a prosecutor to make such a statement outright, and little better to do so obliquely. That said, the Court has no reason to question the the government's explanation that it was trying to highlight that Zentmyer admitted to lying only in the context of his "representation" of those who sought his advice, not to being a liar generally. And the Court notes that the context of Zentmyer's comments did include references to the fact that he had told his lawyer his motto and to his belief that it would be standard procedure for defense attorneys to want to know the truth about their clients' conduct, so the prosecutor's reference to "someone who represented him" was not pulled from thin air. And indeed, before revisiting the transcript of Zentmyer's testimony, the Court's recollection at the time the incident was raised was that the prosecutor's comment had accurately characterized Zentmyer's testimony. So while the comment was improper, because it was inaccurate, the Court sees no basis to infer that the comment was made in bad faith.

But since the remark was improper, the Court must consider whether, in light of the entire record, the defendant was deprived of a fair trial. *United States v. Butler*, 71 F.3d 243, 254 (7th Cir. 1995). Relevant factors include: "1) the nature and seriousness of the prosecutorial misconduct; 2) whether the prosecutor's statements were invited by conduct of defense counsel;

3) whether the trial court instructions to the jury were adequate; 4) whether the defense was able to counter the improper arguments through rebuttal; and 5) the weight of the evidence against the defendant." *Id*.

This is not a close question—perhaps why Bush does not bother to discuss it. To the extent it could be viewed as disparaging to defense lawyers, the comment was so ambiguous and isolated that it cannot be viewed as serious. To the extent the jury heard the remark in the same way Bush did, calling further attention to it after the arguments were over---let alone when he objected the second time, after the jury had been finally instructed after four months of trial---would hardly have helped Bush. Further, it is not reasonable to interpret the remark as denigrating the lawyers who represent the defendants in this matter, even if one concluded that it was a reference to *a* defense lawyer ("some*one* who represented" him). The claim by Bush's counsel that "the government argued that defense lawyers are purveyors of lies," Trial Tr. Vol. 56 at 13452, is a gross mischaracterization. Moreover, the jury was well aware that Zentmyer was not a lawyer at all and could hardly be believed to be representative of the profession or of defense attorneys in particular. Zentmyer dispenses legal advice but has no obligations to be ethical and candid, and the jury no reason to believe his "motto" was pertinent to the work of real lawyers.

The remark was also a single isolated statement amidst five hours of closing argument by the prosecution. That fact, combined with its ambiguity, made its potential impact minimal. And finally, the jury knew better than to take the prosecutor's characterization of Zentmyer's testimony at face value. The jury was repeatedly instructed before, during, and after the trial that attorneys' arguments and comments are not evidence and that the jurors' own memories of the evidence were all that mattered. Finally, in light of the entire record, and the weight of the

evidence against Bush (from sources including his own mouth, his protégé Chad Todd, eyewitnesses, and the searches of his homes and storage areas), the impact of the remark cannot have been decisive or even substantial. The Court can appreciate that defense counsel may be particularly sensitive to the kind of disparagement Bush's counsel understood the prosecutor to have uttered—as evidenced by the over-top-language and stridency of the *post-hoc* objections— but it is fairness to the defendant, not the lawyers, that is paramount. Gabriel Bush was not prejudiced by the prosecutor's comment.

### F.    Ford's Asserted Errors

Defendant Ford briefed some of the "common issues" addressed above, and he raises three further errors warranting discussion: (1) that he was tried without any valid charges against him because he was not named in the Second Superseding Indictment;  (2) that allowing the jury to make Additional Findings of aggravating factors (relevant to sentencing) based upon state law violates the "categorical approach" of using the state's definition of the underlying crime without aggravating factors; and (3) that he was denied the right to plead guilty to Count One by way of declaration.

### a.    Failure to Properly Indict

Regarding the indictment, Ford makes the curious argument that he was unlawfully tried on the indictment on which he was arraigned, to which he pleaded not guilty, to which he attempted to plead guilty (at least in part), and which was never dismissed. He contends that the filing of the Second Superseding Indictment on September 1, 2016 nullified the Superseding Indictment, and because only Paris Poe was named in the Second Superseding Indictment, there were no charges pending against Ford when he went to trial. A week into the trial, Ford moved for dismissal from the case because, he argued, the Second Superseding Indictment had

narrowed the case to a single count against Paris Poe by replacing the prior 10-count Superseding Indictment against nine defendants. Ford Mot., ECF No. 804. He likened a superseding indictment to an amended complaint in a civil case, which replaces the original complaint. He argued that the government must select one indictment on which to proceed to trial. On the record on September 15, 2016, the Court denied the motion. See Trial Tr. Vol. 3 at 333. The Court rejected the premise that a superseding indictment wholly replaces previous ones. The Court explained that there was a new charge returned against Defendant Poe, and that it ultimately might require dismissal of a count of the first Superseding Indictment, but that Ford was in no way prejudiced by that process.

Ford now contends that it was error to deny his motion. Ford's argument is based largely upon a dictionary definition of the word "supersede" as "replace." He also argues that there is no authority to try a defendant on multiple indictments simultaneously unless there is a valid joinder of cases. The second argument could only conceivably apply to Poe, of whom it could be said that the charges came from "multiple indictments simultaneously," but of course there was no prejudice to Ford even if that procedure were erroneous (which Poe does not claim it was).

As to the first argument, dictionary or no, it is not true that a superseding indictment "replaces" the previous indictment in the sense of nullifying it. Many courts have held, primarily in the context of double-jeopardy arguments, that "a superseding indictment does not nullify an original indictment," and "the issuance of a superseding indictment does not terminate the original jeopardy." *United States v. Flores-Perez,* 646 F.3d 667, 671 (9th Cir. 2011) (After a mistrial, a superseding indictment retained the original charge and added more, which did not place the defendant in jeopardy again for the same crime because jeopardy was not terminated when the indictment was superseded). An indictment remains valid until the court grants a

motion to dismiss it; it is not the case that "a superseding indictment instantaneously nullifies the original indictment." *United States v. Vavlitis*, 9 F.3d 206, 209 (1st Cir. 1993) (holding that first indictment was still in effect when in mid-trial government, having failed to arraign on the superseding indictment, dismissed it); *see United States v. Bowen*, 946 F.2d 734, 736 (10th Cir. 1991) (finding "no authority" for notion "that a superseding indictment zaps an earlier indictment to the end that the earlier indictment somehow vanishes into thin air"). A "superseding indictment" is simply "a second indictment issued in the absence of a dismissal of a prior indictment" and "may be returned at any time before a trial on the merits of an earlier indictment." *Bowen*, 946 F.2d at 736. The original indictment remains pending prior to trial, even after the filing of a superseding indictment, unless the original indictment is formally dismissed. *United States v. Yielding*, 657 F.3d 688, 703 (8th Cir. 2011). Absent Speedy Trial issues, the superseding indictment and the original indictment can co-exist. *United States v. Walker*, 363 F.3d 711, 715 (8th Cir. 2004).

Ford has no argument to be made that he was prejudiced by standing trial on the Superseding Indictment simply because the Second Superseding Indictment existed. The government did not move to, and this Court did not, dismiss the Superseding Indictment at any time. And the Second Superseding Indictment had nothing to do with Ford.

Ford contends he was prejudiced because "an adverse jury verdict absent proper indictment constitutes significant harm." Reply 4, ECF No. 1214. But, again, there was a "proper indictment" against Ford. He was arraigned on the Superseding Indictment and pleaded not guilty to it. The charges against him were never dismissed, and as already explained, they did not evaporate because the government superseded against another defendant as to a count that Ford was never charged in.

### b. Additional Findings in Violation of "Categorical Approach" and under Abolished Illinois Law

Ford took issue, along with other defendants, with the submission of special findings against him where they were relevant to offenses as to which the Superseding Indictment and the Notice of Special Findings did not implicate him by name. That issue is addressed above, *see* Section I-A-3, *supra*. Ford's additional arguments are, first, that the Court failed to use the "categorical approach" to defining the state-law racketeering acts in the Instructions for the Additional Findings, and, second, that the findings made against him are aggravating factors that were repealed by the State of Illinois when it abolished the death penalty.

The second argument is patently silly and it is difficult to believe that it is advanced seriously by Ford's counsel, who regularly practice in the state criminal courts. It is true that the aggravating factors in 720 ILCS 5/9-1(b) were grounds upon which a death sentence "may" be imposed, before Illinois abolished that penalty in 2011, *see* 725 ILCS 5/119-1. But it was never understood that those factors pertained *only* to the death penalty. They applied to all cases of first-degree murder (they are housed within the statute prescribing the elements of that offense.)

Ford does not cite a single case from the State of Illinois even suggesting that the aggravating sentencing factors for first-degree murder are invalid now that the ultimate penalty has been abolished by the State. Those aggravators continue to apply to cases in which penalties short of death are sought—indeed, they are the only mechanism for obtaining a term of natural life in prison, a penalty that the State has decidedly not repealed. As the Illinois Appellate Court recently explained in reviewing a defendant's first-degree murder sentence:

> First degree murder (see 720 ILCS 5/9–1(a)(1) (West 2008)) is ordinarily punishable by 20 to 60 years' imprisonment. 730 ILCS 5/5–4.5–20(a)(1) (West Supp.2009). A defendant is eligible for an extended term of 60–100 years (730 ILCS 5/5–4.5–20(a)(2), 5–8–2 (West Supp.2009)) or natural life (730 ILCS 5/5–8–1(a)(1)(b) (West Supp.2009)) if he commits the murder with one of the aggravating factors set forth in section 9–1(b) of the Criminal Code of 1961 (720

ILCS 5/9–1(b) (West 2008)). In this case, the jury found defendant guilty of committing the murder in a "cold, calculated, and premeditated manner" as set forth in section 9–1(b)(11) of the Criminal Code. 720 ILCS 5/9–1(b)(11) (West 2008).

*People v. Delaney*, 2015 IL App (2d) 130573-U, ¶ 34. Indeed, *Delaney* specifically forecloses the idea that aggravating factors were repealed along with the death penalty. In that case, the State sought to lower its burden of proof because it was seeking "only" natural life and not the death penalty, and the court rejected the argument "that the quantum of proof necessary to prove the cold, calculated, and premeditated factor is somehow diminished where the accused faces an extended prison term or natural life imprisonment instead of the death penalty." *Id*. at ¶38. Obviously, the court did not believe that the findings applied only to the death penalty, as Ford now maintains. But this discussion gives Ford's argument more attention than it deserves. There is no reasonable dispute that the aggravating sentencing elements under Illinois law survived the abolishment of the death penalty.

As for Ford's argument about the "categorical approach," he is simply wrong about how the criminal RICO statute functions. Ford contends that, when "murder" is an alleged underlying act of racketeering, the jury should be instructed only on a "generic" definition of the offense— that is, one that ignores aggravating factors that increase the penalty for the crime. But that is plainly not how the RICO statute is set up. As set forth repeatedly in this opinion, the provision that determines the penalty for Ford's conviction on Count One for violating § 1962(d), the RICO conspiracy statute, is set forth in § 1963(a), which provides for a sentence of up to life imprisonment "if the violation is based on a racketeering activity for which the maximum penalty includes life imprisonment." The term "racketeering activity," in turn, is defined by § 1961(1) and, as relevant here, includes "any act or threat involving murder." "Any act" involving murder plainly includes aggravated forms of murder and defeats Ford's argument,

which explains why Ford cites no authority holding that only the penalty for "generic" murder determines whether a RICO conviction carries with it the possibility of a life sentence.[59] Under Illinois law, first degree murder does not carry a life sentence, but certain "acts involving" first degree murder—that is to say, committing first degree murder "in a cold, calculated, and premeditated manner pursuant to a preconceived plan, scheme, and design to take a human life by unlawful means"—are punishable by life imprisonment. Where, as here, it is proven that a RICO violation is based on such acts, that violation also carries a possible life sentence.

Ford's reference to the maximum penalties under Illinois law for conspiracy to commit murder is a total non-sequitur. It might be true that Ford conspired with one or more Hobos to commit murder, but that has nothing to do with the federal charge that he conspired **to violate RICO** through a pattern of racketeering activity that included murder. The penalty for state-law conspiracy has nothing to do with this case. The only penalty provision that applies to Count One is § 1963(a), which provides for a sentence of "life if the violation is based on a racketeering

---

[59] Ford's citation to a manual on criminal RICO for federal prosecutors is not, of course, authoritative, but in any event it provides no support for his argument. The point set out there is that, notwithstanding variations in terminology among state statutes, the meaning of the generic descriptions of racketeering activity set forth in § 1961(1) are to be limned by reference to "the prevailing definition of the offense" as reflected in federal and state statutes, the Model Penal Code, and similar resources. That is a far cry from saying, as Ford does, that a particular state's decision about where to place a baseline definition of "murder" in its statutory homicide scheme (or its failure to use the term "murder" within that scheme) is determinative of the penalty that may be imposed for a violation of the RICO statute. Indeed, contrary to Ford's argument, the need to apply a "generic" definition of murder means that a state's labels are **not** determinative. The penalty for a violation of RICO in a state that started its statutory homicide scheme with a base level defining "murder" as any act that results in the death of another human being, and that carried a maximum sentence of two years, would not preclude the imposition of a life sentence for a RICO violation that was based on conduct that would meet the "generic" definition of murder simply because the state decided to call that act something other than "murder." And in any event, because RICO defines the racketeering act as "any act involving murder," even if the state label were determinative, an aggravated murder is "an act involving murder," and so qualifies for life imprisonment if the state provides such a sentence for that act, whatever it is called.

activity for which the maximum penalty includes life imprisonment." Ford's violation of RICO was conspiring to violate RICO. The violation, *i.e.*, the conspiracy, was based upon racketeering acts for which the maximum penalty includes life imprisonment, namely, the offense of murder in a cold, calculated, and premeditated way within the meaning of Illinois law, as charged in Count One. And as previously noted, whether Ford personally murdered anyone or not is beside the point.

Finally, Ford also mounts a challenge to the constitutionality of the RICO statute. *See* Mot. 8, ECF No. 1184, Reply 11, ECF No. 1214. It consists of one sentence: "Because murder statutes vary between states, and the RICO law is silent as to a definition of murder – including whether it includes differing degrees of murder or whether it is the generic form of murder versus murder with enhancements – the statute is impermissibly vague and violates due process." The Court will be equally concise: the argument is waived for failure to develop it or cite any authority.

### c.     Right to Plead Guilty

Ford's attempt to plead guilty to Count One of the Superseding Indictment was recounted at the outset of this opinion. *See pp*. 4-5, *supra*. Ford now argues: "The court did not allow him to plead because there was uncertainty as to the statutory maximum penalties, or so the court believed. Defendant should have been allowed to plead guilty because the statutory maximum, and the appropriate penalty for guilty plea admonishments, was 20 years." Ford Mot. 12, ECF No. 1184. Ford's cursory argument rests on a premise that he failed to establish, namely, that it is impossible for him to have been sentenced to more than 20 years' imprisonment for the crime of conspiring to violate RICO, where the conspiracy involved murders as acts of racketeering. For reasons already explained, that premise is wrong.

In any case, however, this Court did not prevent Ford from pleading guilty. To accept a guilty plea, the Court must (among other things) determine that the plea is knowing and voluntary; that requires the Court to ensure that the defendant knows what the maximum possible punishment that could be imposed based on the plea of guilty would be. Ford, however, refused to acknowledge the possibility that a life sentence could be imposed based on his conviction on Count One. The Court would not accede to Ford's attempt to escape the potential maximum penalty by declining to acknowledge it. He could have done what Stanley Vaughn did and make a plea declaration with no promise in return, but Ford did not want to risk losing his chance of outright acquittal if he was wrong about the maximum penalty. With the erroneous belief that he would be waiving an argument about his maximum sentence if he entered a plea after being admonished that life imprisonment was possible, he declined to enter a plea. Counsel stated: "[w]e cannot go forward, at least today." Tr. 8, ECF No. 1198. As a result, Ford suffered no prejudice. He was found guilty at trial rather than by plea; he loses nothing there (he does not claim that the possible loss of a credit for acceptance of responsibility under the Sentencing Guidelines was a due-process violation and in view of the guideline range likely to be applicable to Ford—above the maximum offense level of 43, a reduction for acceptance of responsibility would have no effect on the range). And he has preserved his argument that he cannot be sentenced to life. As Ford has no due-process right to the sentence of his choice if the law permits a greater one, Ford's constitutional rights were not violated.

### G.     D. Vaughn's Assertions of Error

Defendant Vaughn does not point to any specific errors require a new trial. He reasserts every issue raised in writing or orally by motion or objection before and during trial, incorporates his co-defendants' arguments as applicable to him. Because Vaughn identifies no specific errors,

nor explains how he was prejudiced before the jury, no more needs to be said about his new-trial motion.

### H. Cumulative Errors

Most defendants also seek new trials based on the principle that, even if an individual error does not require the granting of a new trial, the cumulative effect of multiple errors might. This is not such a case.

To make the case for a new trial based on cumulative errors, a defendant must demonstrate that at least two errors were committed in the course of the trial and that, when they are considered together along with the entire record, the multiple errors so infected the jury's deliberation that they denied the defendant a fundamentally fair trial. *See United States v. Briseno*, 843 F.3d 264, 275 (7th Cir. 2016); *United States v. Tucker*, 714 F.3d 1006, 1017 (7th Cir. 2013).

The defendants have in many instances pointed out "error" without making a case that it had any prejudicial effect, and no defendant has made a persuasive case that the trial was "fundamentally unfair." Even if this Court is wrong about any error(s) committed over the course of the trial, no defendant was so prejudiced by an accumulation of error that it would be a miscarriage of justice to allow the verdicts to stand nonetheless.

\*     \*     \*

Because the jury's General Verdicts and Additional Findings are supported by sufficient evidence, and no defendant has raised an error that necessitates a new trial in the interests of justice, each defendant's motions for judgment of acquittal and for a new trial are denied. The jury's verdicts stand, and sentencing will proceed.

Date: August 8, 2017

John J. Tharp, Jr.
United States District Judge